LOCAL NO. 150, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 71–1689.

United States Court of Appeals, District of Columbia Circuit.

June 20, 1973.

---

Bernard M. Baum, Daniel S. Shulman, Robert H. Baum, Chicago, Ill., and J. Albert Woll, Washington, D. C., were on the brief for petitioner.

Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., at the time the brief was filed, Charles N. Steele, and Alan D. Cirker, Washington, D. C., Attys., N.L.R.B., were on the brief for respondent.

Before McGOWAN, Circuit Judge, and WINTER * and MacKINNON, Circuit Judges.

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1970).

WINTER, Circuit Judge:

The basic question we must decide is whether an employer may be guilty of an unfair labor practice with respect to a union with which it has executed a pre-hire contract, valid under § 8(f) of the National Labor Relations Act, 29 U. S.C. § 158(f) (1965), to the same extent that it may with respect to a union which has gained recognition and secured a contract after traditional demonstration of its majority support. The question arises from the petition of Local 150, International Union of Operating Engineers, AFL–CIO (the union), to review and set aside the Board's decision and order holding that R. J. Smith Construction Company, Inc. (the company) did not violate §§ 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5) and (1), when it unilaterally changed existing wage rates at a time that it had a pre-hire contract with the union. 191 N.L.R.B. No. 135 (members Fanning and Brown dissenting). We conclude that the Board's order is premised upon an erroneous construction of the Act. We therefore set aside its order and remand the case to the Board for entry of an order granting appropriate relief.

## I.

The operative facts are not in dispute and they may be stated succintly:

The union represents employees in the building and construction industry. The company is a contractor in the building and construction industry. In 1964, the union and the company entered into a collective bargaining agreement, the term of which expired January 1, 1966. The agreement adopted the terms, including the wage rates, of a pre-existing master agreement between the union and an employers' association. R. J. Smith, president of the company, testified before the hearing examiner that when he signed this agreement, he had no intention of paying the wage rates prescribed therein. In fact, the company did not comply with the terms of the contract.

No contract existed between the parties from 1966 until October, 1968. During this period, chronic disagreements between them persisted. On October 8, 1968, the company and the union executed two new collective bargaining agreements, which again adopted the terms and conditions of employment of a master agreement between the union and two employers' associations. The contracts recognized the union as the exclusive bargaining agent for the company's equipment operators. The union did not represent, or claim to represent, a majority of the company's employees at this time or at any time during the term of the contracts. It is undisputed that these contracts were pre-hire agreements, i. e., collective bargaining contracts entered into before the union's majority status had been certified under § 9 of the Act.

As with the prior contract, the company never intended to, and did not, conform work conditions to the terms of the contracts. After November 1, 1968, the company initiated a policy of unilateral intermittent pay increases for selected individual employees, without prior notice to, or bargaining with, the union. These individual pay increases did not raise the level of wages to those designated in the contracts.[1]

The union filed an unfair labor practice complaint charging the employer with unilaterally changing the terms of the collective bargaining agreement, and refusing to bargain with the union, in violation of §§ 8(a)(5) and 8(a)(1) of the Act.[2] While the trial examiner concluded, *inter alia*, that the company had violated §§ 8(a)(3) and (1) with respect to the discharge of two employees, he also concluded that there had been no violation of § 8(a)(5) because the parties were not attempting to establish their bargaining relationship for the first time and because the union at no time had a majority status. The Board adopted his recommended conclusions and recommendations. It reasoned that the pre-hire agreements had been validly executed, but they were not binding because the union failed to achieve majority status and that therefore the company did not commit an unfair labor practice by unilaterally changing the terms and conditions of its employees' employment.

## II.

Section 8(f) of the Act validates pre-hire agreements in the construction industry by providing in pertinent part that:

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members . . . because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement . . . *Provided further,* That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

The significance of § 8(f) is manifest when it is remembered that §§ 8(a)(2)

---

1. The company also discharged the only two union equipment operators among its non-supervisory personnel. Two weeks later, they were reinstated with full back pay. Upon reinstatement, they became the only employees to receive full contract wages and fringe benefits. The company has not challenged the finding that its discharge of these employees was an un- fair labor practice, § 8(a)(3) and (1), and the issue is not before us.

2. The union's complaint charged that the refusal to bargain also constituted a violation of § 8(d) and this reference is continued in some of the briefs. Section 8(d) defines what constitutes a refusal to bargain and it need not be separately considered.

and (1) and 8(b)(1)(A) of the Act collectively require that a representative number of employees be hired and that a majority shall have designated the union as their bargaining representative prior to the execution of a valid exclusive bargaining contract. Without § 8 (f), both of these conditions must be met, else both parties to the contract will have committed unfair labor practices.

Congress adopted § 8(f) in 1959 to solve the problems created by the Taft-Hartley Act's extension of the Act to the unique situation prevalent in the construction industry, which had theretofore not been subject to the Act.[3] In most industries other than the construction industry, employment patterns are relatively stable and long-term. But in the building and construction industry,

> it is customary for employers to enter into collective bargaining agreements for periods of time running into the future, perhaps 1 year or in many instances as much as 3 years. Since the vast majority of building projects are of relatively short duration, such labor agreements necessarily apply to jobs which have not been started and may not even be contemplated . . . . One reason for this practice is that it is necessary for the employer to know his labor costs before making the estimate upon which his bid will be based. A second reason is that the employer must be able to have available a supply of skilled craftsmen ready for quick referral.[4]

This arrangement is also advantageous to workers, for it enables a union to know and advise its members of job openings and the union is strengthened in its efforts to maintain wages and working conditions in conformity to the standards in the area.[5] In effect, a construction company typically hires a union before commencing a particular project and before hiring any individual employee in the union. In the normal course of events, as the employer staffs his project from the union's pool of skilled labor, the union attains majority status among the employees.

The final proviso of § 8(f) makes inapplicable the twelve-month bar to election rule established by § 9(c)(3) of the Act, 29 U.S.C. § 159(c)(3) (1965).[6] Therefore, an employer in the construction industry is not required to wait one year before seeking a representation election after he has entered into a pre-hire agreement. He may petition for an election at any time, and we have little doubt that an employer, who after a reasonable period perceives that he is bound by a collective bargaining agreement with a union whose minority status seems permanent and who can advance reasonable grounds to believe that the union has not and will not achieve majority status, may obtain relief under § 9(c). Similarly, thirty percent or more of the employees may petition under § 9(e) to rescind the purported majority status of the union at any time. *See* N.L.R.B. v. Irving and McKelvy, 475 F.2d 1265 (3 Cir., 1973).

Since the company has this remedy, we can find no sanction in the language, history, or policy of § 8(f) for permit-

---

3. Sen.Rep. No. 187, 86th Cong., 1st Sess. (1959), H.R.Rep. No. 741, 86th Cong., 1st Sess. (1959), both reprinted in 2 U.S.Code Cong. & Adm.News, pp. 2318, 2344–2345, and 2424, 2441–2443 (1959). *See* 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, 1064(2) (remarks of Sen. Javits), 1070(3) (remarks of Sen. J. F. Kennedy), 1289(3) (remarks of Sen. Goldwater) (1959). *See also* Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv.L.Rev. 1086, 1121–1122 (1960) ; Fleming, Title

VII: The Taft-Hartley Amendments, 54 Nw.U.L.Rev. 606, 705 (1960).

4. Sen.Rep. No. 187, supra n. 3, at 2344–2345. *See* Fleming, supra n. 3, at 702.

5. *See* Fleming, supra n. 3, at 702–703.

6. *See* Aaron, supra, n. 3, at 1122; Fleming, supra, n. 3, at 706. Section 9(c)(3) provides in pertinent part:

> No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held.

ting an employer to abrogate unilaterally a validly executed pre-hire agreement, or for permitting the employer to commit what is otherwise an unfair labor practice even though at the time of either the union has not achieved majority status. See *Irving* and *McKelvy*, supra.[7] It follows that unions, party to pre-hire agreements, have the right to complain of unfair labor practices, including alleged refusals by the employer to bargain collectively, before the union achieves a majority.[8]

The Board contends that § 8(f) merely exempts the parties from unfair labor practice liability when they execute a pre-hire agreement, but does not validate the agreement regardless of the union's ultimate attainment of majority status. We agree that § 8(f) does not wholly obviate the union's need ultimately to achieve majority status, but we disagree with the Board's conclusion that the employer can commit unfair labor practices before the union becomes a majority. To state the history and purpose of § 8(f) is both to reject the contention and to decide the case, because we cannot conceive of such an exercise in futility on the part of Congress as to validate a contract with a union having minority status, but to permit its abrogation because of the union's minority status. The Board's interpretation, as exemplified by its application in this case, would frustrate Congress' purpose of approving pre-hire agreements in the construction industry, for it would render them voidable at will. If the union, or the employer, can neither bring nor maintain unfair labor practice complaints, pre-hire agreements would be virtually unenforceable. We are certain that this was not the purpose of Congress.

Moreover, under the Board's interpretation, an employer, unhappy with a pre-hire agreement, can avoid it by discouraging union membership through flagrant unfair labor practices, thereby insuring that the union never attains a majority. This case illustrates that danger. Credible testimony established that the company never intended to comply with its labor agreements; it refused to negotiate with the union; it gave selective pay increases; it fired its only two union employees; and it refused to honor the contracts' hiring hall and union security clauses. Again, we perceive the Congressional purpose to be to the contrary.

Finally, prior Board precedent supports our interpretation of § 8(f). Oilfield Maintenance Co., Inc., 142 N.L.R.B. 1384 (1963), held that an employer was bound to a pre-hire agreement and that therefore its failure to observe its provisions constituted an unfair labor practice. The opinion explained: "Although . . . the majority status of the [union] prior to the commission of the unfair labor practices has not been demonstrated . . ., the [union's] . . . contract would still be valid under Sec-

---

7. In *Irving* and *McKelvy*, the Third Circuit expressly reserved the issue presented in the instant case. In discussing the Board's decision in the instant case, the Third Circuit thought its case distinguishable because the contract in the instant case had neither a union security nor a dues checkoff clause. Our examination of the record in our case shows that both master agreements had union security clauses, although they did not have dues checkoff provisions. In any event, it is most significant that the Third Circuit concluded that: "[N]othing in either the text or the legislative history of § 8(f) suggests that it was intended to leave construction industry employers free to repudiate contracts at will." 475 F.2d at p. 1271.

8. Since in our view, § 8(f) does not insulate an employer in the building and construction industry from the unfair labor practice proscriptions of § 8 (except entering into a contract with a minority union), the company's obligation to bargain was governed by the provisions of § 8(d) that:
. . . no party to such contract shall . . . modify such contract, unless the party desiring such . . . modification (1) serves a written notice . . . (2) offers to meet and confer with the other party . . . and (4) continues in full force and effect . . . all the terms and conditions of the existing contract . . . . .

tion 8(f)." *Id.*, at 1387. The opinion "specifically note[d] in this regard the final proviso to Section 8(f) . . . ." *Id.*, at 1387 n. 10.

We hold therefore that an employer, who has entered into a validly executed § 8(f) pre-hire agreement may, after a reasonable period, seek a representation election to challenge an enduring minority union, but until he does and prevails, he should be held to the same standard of conduct in regard to unfair labor practices as an employer who has entered into a collective bargaining agreement with a union certified to have majority status. Therefore, the company committed an unfair labor practice when it unilaterally altered the terms of the contract and refused to bargain collectively with the union, and so we vacate and set aside the Board's order and remand the case for entry of an order granting appropriate relief.

Order set aside; case remanded.

Robb, Circuit Judge, filed an opinion dissenting in part.