INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, LOCAL 3, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

John Deklewa, Theodore Deklewa and Robert Deklewa, d/b/a John Deklewa & Sons and/or John Deklewa & Sons, Inc., Intervenors.

John DEKLEWA, Theodore Deklewa and Robert Deklewa, d/b/a John Deklewa & Sons and/or John Deklewa & Sons, Inc., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

International Association of Bridge, Structural and Ornamental Iron Workers, Local 3, Intervenor.

John DEKLEWA, Theodore Deklewa and Robert Deklewa, d/b/a John Deklewa & Sons and/or John Deklewa & Sons, Inc., Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

International Association of Bridge, Structural and Ornamental Iron Workers, Local 3, Intervenor.

Nos. 87–3121, 87–3192 and 87–3231.

United States Court of Appeals, Third Circuit.

Argued Oct. 21, 1987.

Decided April 12, 1988.

Stanford A. Segal, Gatz, Cohen, Segal & Koerner, P.A., Pittsburgh, Pa., Laurence Cohen, Robert Kurnick, Sherman, Dunn, Cohen, Liefer & Counts, P.C., Washington, D.C., for respondent N.L.R.B.

Charles E. Murphy, Philip A. Miscimarra, Ronald Turner, Murphy, Smith & Polk, Chicago, Ill., for amicus curiae Associated General Contractors of America.

Gerard C. Smetana, Ruberry, Phares, Abramson & Fox, Chicago, Ill., for amicus curiae Council on Labor Law Equality.

Edwin Vieira, Jr., Rossie D. Alston, Jr., Springfield, Va., for amicus curiae National Right to Work Legal Defense Foundation.

Before HIGGINBOTHAM, SCIRICA and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

On this appeal, the Union (Local 3, International Association of Bridge, Structural and Ornamental Ironworkers) and the Company (John Deklewa & Sons) seek review of an order entered by the National Labor Relations Board ("Board") on February 20, 1987.[1] That order, which overturned an earlier rule (the *R.J. Smith* rule)[2] promulgated by the Board, held that: (1) pre-hire agreements sanctioned under § 8(f) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(f), are not voidable at will; (2) that the employer, John Deklewa & Sons ("Deklewa" or "the Company"), committed an unfair labor practice in violation of § 8(a)(5) of the Act, 29 U.S.C. 158(a)(5), when it repudiated its pre-hire agreement with the International Association of Bridge, Structural and Ornamental Iron Workers, Local 3, AFL–CIO ("the Union"); (3) that Deklewa's obligation to bargain with the Union, because it was based on the pre-hire agreement, expired with that agreement; and (4) that these holdings should be applied retroactively. The Board has cross-petitioned for enforcement of its February 20, 1987 order.

Both the Union and the Company in petitioning for review of the Board's order challenge different features of the Board's ruling. Deklewa contends that the Board erred in finding that pre-hire agreements were not unilaterally voidable. The Union, while agreeing with the Board that pre-hire agreements should not be unilaterally voidable, claims the Board erred in holding that an employer's duty to bargain with the Union terminates upon the expiration date of the pre-hire agreement.

I.

Deklewa is engaged in the construction business. In June 1960, although not a member of the Ironworker Employers Association of Western Pennsylvania (the "Association"), Deklewa agreed to be bound by the agreement between the Association and the Ironworkers Union. Deklewa adhered to each successive agreement between the Association and the Union, for a twenty year period between June 24,

1. The Board's decision is reported at 282 NLRB No. 184, 124 LRRM 1190 (1987).

2. See *R.J. Smith Construction Co.*, 191 NLRB 693 (1971), *enforcement denied sub nom. Operating Engineers Local 150 v. NLRB*, 480 F.2d 1186 (D.C.Cir.1973).

1960 and October 1, 1980. In October 1980, Deklewa joined the Association as a member. The pre-hire agreement in dispute covered the years 1982 to 1985.

Deklewa has engaged in a number of projects which required ironworkers. When it performed the work itself, Deklewa hired ironworkers through the union hiring hall. When Deklewa engaged subcontractors, it subcontracted only to companies bound by the same union agreement. In September 1983, during the term of the 1982–1985 agreement, Deklewa resigned from the Association and notified the Union that it was repudiating the agreement. Deklewa then subcontracted iron work to an employer who was not a party to the Union agreement. On October 14, 1983, the Union filed the instant unfair labor practice charge.

The Board agreed to hear the case based on a stipulated set of facts. As we have noted, the Board, in a ruling which reversed its prior construction of the Act, held that Deklewa had violated § 8(a)(5) of the Act by unilaterally repudiating the 1982–1985 agreement, but further held that after the agreement had expired in 1985, Deklewa was not obligated to bargain with the Union. The Board also held that its decision would apply to Deklewa's case and to all cases then pending as well as all cases in the future.

The Board based its decision on a detailed examination of the legislative history of the Act and in particular § 8(f). In order to understand the Board's order and to provide the context in which to analyze its decision, we too, turn to the legislative history of § 8(f).

## II.

### A.

Section 9(a) of the Act, 29 U.S.C. § 159(a) provides that "a representative ... designated or selected for the purposes of collective bargaining by the majority of the employees in a unit ... shall be the exclusive representative of all the employees in such unit for the purposes of collective bargaining...." Section 8(a)(5) of the Act imposes upon an employer whose employees "designate or select" an exclusive representative, the "duty to bargain collectively with the representative of his employees." 29 U.S.C. § 158(a)(5). The Act does not provide for the method by which the employees choose their representative. However, employees may compel recognition of their designated union representative as their exclusive bargaining agent by prevailing in an election and by certification of the union by the NLRB. 29 U.S.C. § 159(b), (c).

The majority status of a union as the exclusive representative of the employees, once established, is irrebuttably presumed for a reasonable period of time.[3] Upon the expiration of a collective bargaining agreement, the employer may not withdraw recognition of the union unilaterally unless it has reasonable, good faith grounds for believing that the union has lost its majority status. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 597 n. 11, 89 S.Ct. 1918, 1931 n. 11, 23 L.Ed.2d 547 (1969); *NLRB v. Leatherwood Drilling Co.*, 513 F.2d 270 (5th Cir.), *cert. denied*, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975); *NLRB v. Frick and Co.*, 423 F.2d 1327, 1331 (3d Cir.1970).

As is apparent from the statute and the case law construing it, the Act assumes that a stable group of employees who are capable of designating a union representative or participating in a certification election are employed by management in a continuing work relationship.[4] This assumption works well for employer-employee relations in manufacturing and in many other fields of endeavor; it does not work well in the construction field. In the construction industry, work typically varies by the season and the size of the project. Workers do not usually remain at a single job site long enough to designate a union

---

3. *See Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); *Toltec Metals, Inc. v. NLRB*, 490 F.2d 1122 (3d Cir.1974).

4. *See generally, Fall River Dyeing & Finishing Corp. v. NLRB*, —— U.S. ——, 107 S.Ct. 2225, 2238 n. 15, 96 L.Ed.2d 22 (1987).

representative. Moreover, because of the mobility of the construction industry workforce, elections and Board certification many times prove impracticable.

As a consequence, this situation presented problems for both management and its employees. The employers sought accurate estimates of their labor costs when they bid on projects.[5] Having a guaranteed union contract was virtually a *sine qua non* toward meeting this goal. On the other hand, employees in the construction industry desired all the benefits of union representation that were available to workers in other fields.[6] In an attempt to satisfy both of these interests, a pre-hire agreement practice developed in the construction industry. A pre-hire agreement is a contract agreed to by an employer and a union *before* the workers to be covered by the contract have been hired. *Robert's Dictionary of Industrial Relations*, Third Edition 562 (1986). *See also* 29 U.S.C. 158(f).

With respect to industries other than the construction industry, the Board had determined that pre-hire agreements were illegal because they designated an exclusive union representative of the employees before an election had been held and before the union's majority status had been tested. Thus, when the Board assumed jurisdiction over the construction industry,[7] it was required to address the day to day practices of an industry whose operations violated the Act as interpreted and administered by the Board. Accordingly, the Board applied the general prohibition against pre-hire agreements to the construction industry and suggested that the industry petition Congress for an exception. *See generally NLRB v. Irvin*, 475 F.2d 1265, 1267 (3d Cir.1973) *Daniel Hamm Drayage Co., Inc.*, 84 NLRB 458, 460 (1949) *enf'd* 185 F.2d 1020 (5th Cir.1951).

### B.

Thus began an eight year effort which culminated in a number of amendments, including the addition of § 8(f), to the NLRA in 1959. It provides:

> It shall not be an unfair labor practice ... for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction industry employees are members ... because (1) the majority status of such labor organizations has not been established under the provisions of section 9 of the Act prior to the making of such agreement ... *Provided* ... That any [such] agreement shall not be a bar to a petition [for a representation election] filed pursuant to section 9(c)....

29 U.S.C. 158(f).

Other subsections of § 8(f) which we have not quoted, allow construction industry pre-hire agreements to contain union security clauses; exclusive hiring hall provisions; and job referral requirements. At the same time as § 8(f) was enacted, Congress also added § 8(b)(7)(C) which, *inter alia*, prevents a union from picketing in order to force an employer to sign a pre-hire agreement.

Some of the effects of these statutory changes are clear—employers and unions in the construction industry are permitted to enter into pre-hire agreements which designate the union as the exclusive representative of a company's employees without a formal election, and the employees, now union members, may at any time vote to decertify the union as their exclusive representative utilizing the formal Board procedures. Two issues, however, were not resolved by § 8(f): (1) whether during its term a § 8(f) agreement is as binding and enforceable as any other union agreement, and (2) whether a § 8(f) agreement

---

**5.** *See* S.Rep. No. 187, 86th Cong., 1st Sess. 28 (1959), U.S.Code Cong. & Admin.News 1959, p. 2318, reprinted in I Legislative History of the Labor–Management Reporting and Disclosure Act of 1959, at 424 (G.P.O.1959) ("Leg. History").

**6.** *Id.*

**7.** *Ozark Dam Contractors*, 77 NLRB 1136 (1948); *Carpenters Local 74 (Watson's Specialty)*, 80 NLRB 533 (1948).

requires an employer to bargain with the union as the employees' "exclusive representative" *after* the pre-hire agreement has expired.

In the typical employer-union context, the employer is bound to bargain with the exclusive representative even after the contract has expired. In such a case, recognition of the union can only be withdrawn if the employer has a reasonable, good faith belief that the union does not represent a majority of the employees. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 597 n. 11, 89 S.Ct. 1918, 1931 n. 11, 23 L.Ed.2d 547 (1969); *NLRB v. Leatherwood Drilling Co.*, 513 F.2d 270 (5th Cir.), *cert. denied*, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975); *NLRB v. Frick and Co.*, 423 F.2d 1327, 1331 (3d Cir.1970). After the expiration of a collective bargaining agreement both parties, the employer and the union, are not free from the strictures of the agreement until an "impasse" in negotiations is reached. *See generally, N.L.R.B. v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *Taft Broadcasting Co. v. AFTRA*, 163 NLRB 475 (1967). The employer is then free to impose terms on the employees, and the employees in turn, may then picket, strike or exert other forms of pressure.

In *R.J. Smith Construction Co.*, 191 NLRB 693 (1971), *enf. denied sub nom. Local No. 150, International Union of Operating Engineers v. NLRB*, 480 F.2d 1186 (D.C. Cir.1973), and *Ruttmann Construction Co.*, 191 NLRB 701 (1971), the Board interpreted § 8(f) to mean that a "pre-hire agreement is merely a preliminary step that contemplates further action for the development of a full bargaining relationship." *Ruttmann*, 191 NLRB at 702. The Board held that until that "further action" occurred, either party was free to repudiate the agreement.

*Ruttmann* followed the rule which the Board had announced in *R.J. Smith* explaining:

> Congress enacted Section 8(f) of the Act in recognition of special conditions that existed in the construction industry. These special conditions included the fact that employers not only needed an assurance that skilled labor would be available but needed a basis for estimating labor costs in bidding on construction contracts. Employees, on the other hand, were often denied the benefits of union representation because of the temporary and sporadic nature of their employment. It is clear, however, that in enacting Section 8(f) to assist in resolving such problems, Congress merely permitted parties to enter into such pre-hire agreements without violating the Act. It does not mean that a failure to abide by such an agreement is automatically a refusal to bargain. In essence, therefore, this pre-hire agreement is merely a preliminary step that contemplates further action or the development of a full bargaining relationship: such actions may include the execution of a supplemental agreement for certain projects or covering a certain area and the hiring of employees who are usually referred by the union or unions with whom there is a pre-hire agreement.

*Ruttmann*, 191 NLRB at 702, 77 LRRM at 1498 (footnote omitted).

The *R.J. Smith* rule was rejected by the D.C. Circuit when that court denied enforcement in *Local No. 150 International Union of Operating Engineers v. NLRB*, 480 F.2d 1186 (D.C. Cir.1973) *denying enforcement of R.J. Smith Construction Co.*, 191 NLRB 693 (1971). However, despite the rejection of the *R.J. Smith* rule in *Local 150*, the Board continued to adhere to the *R.J. Smith* pre-hire doctrine. Hence, it was not surprising that some three years after *Local 150* had been decided, the same issue surfaced in the same circuit in *Local Union 103 International Association of Bridge Structural Ornamental Iron Workers v. NLRB* 535 F.2d 87 (D.C. Circuit 1976). As could be anticipated, the *Local 103* court followed the precedent announced in *Local 150* and once again rejected the *R.J. Smith* rule. The *Local 103* ruling, however, was reversed by the Supreme Court in *NLRB v. Local 103, International Association of Bridge and Ornamental Iron Workers (Higdon Construction Co.)*, 434 U.S. 335, 341, 98 S.Ct. 651, 655, 54 L.Ed. 2d 586 (1978).

In *Higdon,* the Supreme Court reviewed and upheld the Board's *R.J. Smith* rule concluding "that the Board's construction of the Act, although perhaps not the only tenable one, is an acceptable reading of the statutory language and a reasonable implementation of the purposes of the relevant statutory sections." *Id.* at 341, 98 S.Ct. at 656.

Subsequent case law developed a complex, fact-specific analysis for determining what types of further actions would "convert" a § 8(f) pre-hire agreement into a full bargaining relationship under § 9(a). The complexities of the conversion analysis led to what the Board termed in its present *Deklewa* ruling "fractious litigation." 282 NLRB at ——, 124 LRRM at 1193. To forestall such litigation, the Board undertook a reconsideration of the *R.J. Smith* rule. Its reconsideration resulted in the interpretation of § 8(f) which the Board seeks to enforce today by its cross-application.

### III.

### A.

In the instant case, the employer, Deklewa, unilaterally repudiated its pre-hire agreement with the Union. The Union then filed an unfair labor practice charge with the Board, asserting that Deklewa was not free to repudiate its agreement. The Union's unfair labor practice charge against Deklewa became the vehicle for the Board's reconsideration of the *R.J. Smith* rule. The Board ultimately concluded that the *R.J. Smith* rule had proved inadequate, and that in practice the rule served to defeat the very interests that the Act and § 8(f) were designed to protect.

The Board then fashioned a new interpretation of § 8(f) which sought to accommodate both employers' and employees' interests. In response to the construction industry *employees'* concerns, that *R.J. Smith* permitted management to void pre-hire agreements at will, the Board held that § 8(f) agreements were no longer unilaterally voidable, and that until expiration they would be enforced by the Board. The

Board also responded to construction industry *employers'* complaints that the "conversion doctrine", by which a pre-hire agreement is converted into a standard collective bargaining agreement, effectively operated to force them, unlike all other employers, to bargain with a union whose majority status had never been established. The Board in its present order, which we review here, abandoned the "conversion doctrine," and held that § 8(f) pre-hire agreements were only enforceable during the term of the agreement and could not be converted into traditional collective bargaining agreements with lingering rights and obligations absent an election and certification.

With respect to the specific case before it, the Board ordered Deklewa to make whole any employees that may have suffered losses as a result of Deklewa's failure to adhere to the pre-hire agreement until the expiration of the agreement in 1985. However, the Board declined to extend this make whole remedy beyond the expiration of the agreement. Thus, Deklewa was not held responsible for any losses which may have occurred after the pre-hire agreement's expiration date. Not surprisingly, both Deklewa and the Union have challenged this decision and have petitioned for review.

### B.

■ In reviewing the Board's interpretation of the Act, this court must determine if the Board's interpretation is reasonable. *Slaughter v. NLRB,* 794 F.2d 120 (3d Cir. 1986). Only "[i]nterpretations of the Act that are inconsistent with the statutory mandate, that frustrate the congressional policy, or that rest on an erroneous legal foundation" must be set aside. *Id.* at 125.

Given the deferential standard of review afforded the Board's interpretation of the Act, both Deklewa and the Union face a heavy burden unless as Deklewa at least claims, our established standard has given way to a definitive and independent interpretation of § 8(f) by the Supreme Court and is thus inapplicable in this proceeding. Deklewa argues that in two decisions inter-

preting § 8(f), *NLRB v. Ironworkers Local 103 (Higdon Construction Co.)*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978) and *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983), the Supreme Court adopted the Board's construction as expressed in *R.J. Smith* as its own. Deklewa then contends that the Board is bound by the standard announced in those rulings.

Deklewa's argument is flawed. In neither case has the Supreme Court adopted the Board's *R.J. Smith* interpretation of § 8(f) as definitive and binding. Indeed in *Higdon*, as we have previously observed, the Supreme Court expressly noted that:

We have concluded that the Board's construction of the Act, although perhaps not the only tenable one, is an acceptable reading of the statutory language and a reasonable implementation of the purposes of the relevant statutory provisions.

434 U.S. at 341, 98 S.Ct. at 656. The Supreme Court thus made clear that it was merely reviewing the Board's interpretation of § 8(f) and not substituting its own judgment or prescribing its own interpretation of the statute:

The Board's resolution of the conflicting claims in this case represents a defensible construction of the statute and is entitled to considerable deference. Courts may prefer a different application of the relevant sections, but "[t]he function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board subject to limited judicial review." *NLRB v. Truck Drivers*, 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957); *NLRB v. Insurance Agents*, 361 U.S. 477, 499, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960). Of course, "recognition of the appropriate sphere of the administrative power ... obviously cannot exclude all judicial review of the Board's actions" *Ibid....* In *American Ship Building Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965), the Court was "unable to find that any fair construction of the provisions relied upon by the Board

... can support its finding of an unfair labor practice.... [T]he role assumed by the Board ... [was] fundamentally inconsistent with the structure of the Act and the function of the sections relied upon." As we have explained, this is not the case here.

434 U.S. at 350, 98 S.Ct. at 660.

While *McNeff* is not as explicit as *Higdon* in making it clear that the Supreme Court was merely reviewing the Board's interpretation and not establishing one of its own, nowhere in the *McNeff* opinion does the Court hold that the statute requires § 8(f) agreements to be voidable. Furthermore, *McNeff* relies very heavily upon *Higdon* which did make it clear that the Court was doing no more than holding that the Board's reading of the act was reasonable. In addition, the issue of repudiation was not before the Court in *McNeff*, as the parties in the *McNeff* case were litigating over monies allegedly due pursuant to a contract that had *not* been repudiated.

Having rejected Deklewa's argument that the Supreme Court has adopted the *R.J. Smith* rule as its own, our task now requires us to review the Board's new § 8(f) interpretation to determine if it is reasonable and consistent with the Board's statutory mandate. We are mindful in so doing that while the Board's earlier interpretation of § 8(f) was sustained as reasonable by the Supreme Court (*Higdon*, 434 U.S. at 350, 98 S.Ct. at 660), that interpretation did not preclude the Board from fashioning a more effective rule, once it determined that its earlier *R.J. Smith* rule was not serving its designed purpose. As decisional law has made clear, it is not the function of the courts to interpret § 8(f), nor is any initial interpretation of one act made by the Board to be deemed "frozen in concrete." *See Mosey Manufacturing Co., Inc. v. NLRB*, 701 F.2d 610, 612 (7th Cir. 1983) (discussing changes by the Board in various election rulings). Rather, our function as a reviewing court is to determine the reasonableness of the present reading

of § 8(f), regardless of any earlier pronouncement made by the Board.

In fulfilling that function, we are fortunate here in having the benefit of the Board's explanation of its earlier adoption of the *R.J. Smith* doctrine; its extensive reasons for overruling that doctrine; and its persuasive analysis of Congress' intent and objectives which has now led the Board to restructure its § 8(f) interpretation. 282 NLRB at ——, 124 LRRM at 1190–93. Because we are obliged to refer to both the *R.J. Smith* rule adopted by an earlier Board and the *Deklewa* rule adopted by the present Board we will identify the particular Board by reference to either the "*R.J. Smith* Board" or the "*Deklewa* Board."

### IV.

The *Deklewa* Board characterized the *R.J. Smith* Board's action as follows:

Past consideration of 8(f)'s statutory language and legislative history has been brief. In R.J. Smith, the Board merely recited the aforementioned congressional language recognizing the contemporary contractual practice in the construction industry and the reasons for that practice. Then, after quoting Section 8(f) in full, the Board summarily identified the second proviso as the linchpin to interpreting the entire section and concluded that the proviso must have meant that Congress intended to permit testing an 8(f) signatory union's majority status during a contract term either by election or by litigation of refusal to bargain charges.

282 NLRB at ——, 124 LRRM at 1190.[8]

The *Deklewa* Board in its re-examination of § 8(f) identified a number of significant problems with the earlier rule announced by the *R.J. Smith* Board. The *Deklewa* Board noted that there is no support in the legislative history or the language of the statute for the interpretation of § 8(f) that the *R.J. Smith* Board declared. More specifically, the *Deklewa* Board concluded that there is no support in the legislative history

or the text of the act for allowing either party to unilaterally repudiate a § 8(f) agreement. The *Deklewa* Board observed "if the legislative history and statutory language ... indicate anything, it is an intent by Congress to legitimate and make enforceable the array of construction industry bargaining, referral, hiring, and employment practices that the Board previously found to be unlawful, and thus unenforceable under the Act." 282 NLRB at ——, 124 LRRM at 1191.

Because we must review the *Deklewa* Board's actions for its reasonableness, we think it appropriate to quote those portions of the *Deklewa* Board's opinion which explain in detail why the *R.J. Smith* rule can no longer be sustained. Among other things, the *Deklewa* Board stated:

We find that this law now often operates in a matter [sic] that contradicts the apparent congressional intent. For example, current law views an 8(f) agreement as merely a nonbinding and unenforceable preliminary step to the ultimate establishment of a collective-bargaining agreement that can be recognized and enforced under the Act. There is no express language in the legislative history or the text of the act declaring a congressional view that such collective bargaining agreements, specifically authorized by the Act, are nonbinding, unenforceable, or subject to repudiation at will. Congress plainly mandated that 8(f) agreements be voluntary. Yet, contrary to the assertion in Ruttmann and R.J. Smith, it simply does not necessarily follow that because an 8(f) agreement can only be entered into voluntarily either party to the agreement is unfettered in its right "voluntarily" to repudiate the agreement.

\* \* \* \* \* \*

In this regard, we believe that there has also been a critical distortion of the significance of the second proviso to Section 8(f) and its role in preserving employee free choice. It is clear that the

---

8. The relevant text of § 8(f) has been reproduced in Section II.B. of this opinion. The second proviso of § 8(f) permits a representa- tion election, pursuant to § 9(c) of the Act, to take place during the pendency of a pre-hire agreement.

proviso permits inquiry into a union's majority status during a contract term. There is, however, a significant distinction between permitting such an inquiry through the Board's representational processes—the mechanism expressly mentioned in the provision—and permitting unilateral anticipatory repudiation of a collective-bargaining agreement prior to resolution of an inquiry in unfair labor practice proceedings. Because such a right of unilateral repudiation is so antithetical to traditional principles of collective-bargaining under the Act, it seems likely that Congress would have expressly stated such a right if it intended to create one.

282 NLRB at ——, 124 LRRM at 1191 (footnotes omitted).

The *Deklewa* Board identified the overarching objectives of the Act as promotion and protection of employee free choice and labor relations stability. It then tested the *R.J. Smith* rule by the degree to which it satisfied those objectives. In holding that the *R.J. Smith* rule failed this test, the *Deklewa* Board went on to state:

> [The] pivotal argument in R.J. Smith is simply wrong. A rule granting unilateral repudiation rights to an employer who voluntarily enters into a collective-bargaining agreement is not a necessary predicate for advancement of the employee free choice principles embodied in the second proviso. ... [U]nder current 8(f) law, an employer's decision to repudiate may be based on the employer's own economic considerations, without reference to or concern for the employees' desire to continue the status quo. Even if the employer has a legitimate question as to its employees' representational desires, Congress has expressly provided an electoral mechanism for testing them. Accordingly, in our view, it is more anomalous to hold, as in R.J. Smith, that a proviso enacted to preserve employees' right to choose, change, or reject their own collective-bargaining representative can serve as a basis for an employer unilaterally to repudiate a voluntary col-

lective-bargaining agreement for any reason it chooses.

\* \* \* \* \* \*

> The Board's decision in R.J. Smith and its conversion doctrine fare no better when measured against the congressional objective of fostering labor relations stability in the construction industry. First, it is obvious that a rule that sanctions unilateral contract repudiation and the inevitable disruptions that result is not conducive to labor relations stability. The Board in R.J. Smith did not even allude to such potential for disruptions, nor did it attempt to reconcile this potential with Congress' desire in enacting 8(f) for preserving contracts in the construction industry. Indeed, although we now view R.J. Smith and its progeny as a failed attempt to effectuate free choice, we also find that this attempt unnecessarily deemphasized stability in the industry.

282 NLRB at ——, 124 LRRM at 1192 (footnotes omitted).

In short, the *Deklewa* Board concluded:

> In summary, we conclude that the Board's 8(f) law, as it currently operates, does not comport fully with Section 8(f)'s text and legislative history, is not the best way to advance employee free choice and labor relations stability in the construction industry, and entails evidentiary determinations that are inexact, impractical and generally insufficient to support the conclusions they purport to demonstrate. Accordingly, we overrule R.J. Smith....

282 NLRB at ——, 124 LRRM at 1193.

Having found the *R.J. Smith* rule inadequate to serve the Congressional intent and purposes of § 8(f); the *Deklewa* Board then discussed those alternatives which satisfy the protection of employee free choice and labor relations stability. To achieve those purposes, the *Deklewa* Board ruled that a § 8(f) pre-hire agreement was to bind the parties for its duration but upon expiration of such a pre-hire agreement, all collective bargaining obligations would cease. In so ruling, the *Deklewa* Board also provided that a § 8(f) agreement could

not be converted into a § 9(a) agreement, i.e. that a union which was a representative pursuant to a § 8(f) pre-hire agreement, could not be converted into a traditional exclusive representative with majority status with whom the employer was required to bargain, absent an election and certification.

The *Deklewa* Board, obviously recognizing that agency re-interpretations of the Act are not undertaken lightly and that in order to be justified, a more appropriate balance must be struck between the Congressional policies embodied in § 8(f) and the Act as a whole, took pains to explain the reasons for its change of mind. We reproduce that statement here:

> We have not merely parsed the case precedent and legislative history in order to arrive at yet another "tenable" construction of the statutory language. Rather, consistent with our mission as the administrative agency responsible for enforcing the NLRA, we have applied our cumulative individual and institutional experience and expertise toward achieving, consistent with our interpretation of the legislative intent, what we perceive to be a better application of the statute. Given the present state of the law in this area, we see no alternative but to exercise our prerogative to do so. Admittedly, we have not been able in this one decision to anticipate every ramification of the principles we announce today. Nor do we deem it wise to attempt to do so, since we hope to be afforded the latitude to employ, as we have in the past, the fine crucible of case-by-case experience in which to test and refine these principles, and which the administrative process itself makes possible.

282 NLRB at —— n. 40, 124 LRRM at 1194 n. 40.

The Board then summarized the actions which it had taken in its reformulation of § 8(f):

> [The] basic principles we advance today provide an overall framework for the interpretation and application of Section 8(f) which will enable parties to 8(f) agreements and employees to know their respective rights, privileges, and obligations at all stages in their relationship. When parties enter into an 8(f) agreement, they will be required by virtue of Section 8(a)(5) and Section 8(b)(3), to comply with that agreement unless the employees vote, in a Board-conducted election to reject (decertify) or change their bargaining representative. Neither employers nor unions who are party to 8(f) agreements will be free unilaterally to repudiate such agreements. During its term, an 8(f) contract will not act as a bar to petitions pursuant to Section 9(c) or (e).

282 NLRB at ——, 124 LRRM at 1194.

Having analyzed the *Deklewa* Board's reasons for rejecting the *R.J. Smith* rule and its reasons for adopting the *Deklewa* rule we cannot say that the Board's actions in both regards were unreasonable. Neither the Company nor the Union has demonstrated by their arguments that the Board's *Deklewa* interpretation of § 8(f) is inconsistent with the Congressional mandate or that it would frustrate, rather than further, congressional policy. *See Slaughter v. NLRB*, 794 F.2d 120 (3d Cir.1986). While it is true that the Board's new interpretation varies from its prior interpretation, that variance is not fatal so long as the interpretation is reasonable and consistent with the Act. As the Supreme Court has instructed in *Higdon* "an administrative agency is not disqualified from changing its mind." *Higdon*, 434 U.S. at 351, 98 S.Ct. at 660.[9]

Our independent analysis of both the legislative history and the text of the statute itself, reveals no viable ground on which to challenge the reasonableness of the Board's *Deklewa* interpretation. In reviewing the *Deklewa* Board's analysis, we are satisfied that the Board, by steering a

---

**9.** As Justice Frankfurter once commented: "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters National Bank and Trust Co.*, 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259 (1949) (Frankfurter, J., dissenting).

middle course, reasonably balanced the interests of labor and management. "The function of striking that balance to effectuate National Labor Policy is often a difficult and delicate responsibility, which Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *NLRB v. Truck Drivers Union*, 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957). Reviewed under our *Slaughter* [10] standard, the Board's new interpretation must be sustained.

## V.

The final issue raised by the parties is the Board's decision to apply its new interpretation to this case and to all pending cases at whatever stage. [11] The parties disagree as to whether this new rule, announced by the Board in *Deklewa* may be applied retroactively.

After setting forth its new interpretation of § 8(f), the Board confronted the final issue of whether or not its new rule should be applied retroactively. The Board noted that its usual practice was to apply new policies and standards to all cases no matter what stage in the litigation they had reached. 282 NLRB at ——, 124 LRRM at 1198. Although the Board noted that its new interpretation represented a "sharp departure" from the *R.J. Smith* rule, it nevertheless determined that a retroactive application of this rule was appropriate.

## A.

■ As with all legal issues, we first determine our standard of review. At the outset we observe that Deklewa and the

Associated General Contractors of America, which filed a brief as *amicus curiae*, urge that we review the retroactivity issue using an abuse of discretion standard. The Union, in its reply brief, apparently agrees with that standard. Reply Brief of Union at 17. We have been unable to discern from the brief filed by the Board, any suggested standard of review respecting just the issue of retroactivity. In any event, none of the parties have cited us to any caselaw which would inform us as to the standard we should employ.

Our independent research reveals that with specific reference to a Board's ruling on retroactivity, the Second Circuit has held that "while we are of course not bound by the Board's views on retroactive application, we should defer to them absent some manifest injustice." *NLRB v. Semco Printing Center, Inc.*, 721 F.2d 886, 8892 (2d Cir.1983). We agree with the *Semco* standard, particularly since it comports with our oft spoken view that in matters involving interpretation of the Act, the Board is entitled to deference. [12] *See e.g. E.I. Dupont DeNemours and Co. (Chestnut Run) v. NLRB*, 733 F.2d 296, 297 (3d Cir.1984). While a decision to hold a new rule retroactive is not strictly a question of statutory interpretation, we are nevertheless persuaded that when the Board changes a rule and makes it retroactive, particularly when the Board assigns as its reasons for doing so the furtherance of the fundamental statutory policies of employee free choice and labor relations stability, the Board should be entitled to exercise its broadest power. *See e.g. Mosey Manufacturing Co., Inc. v. NLRB*, 701 F.2d 610,

---

**10.** *Slaughter v. NLRB*, 794 F.2d 120 (3d Cir. 1986), *and see* Part III. B. *supra*.

**11.** 282 NLRB at ——, 124 LRRM at 1198.

**12.** The result we reach today, would have been the same had we adopted the abuse of discretion standard, as urged upon us by Deklewa, the Union, and the *amicus*. In light of the Board's analysis and reasoning, we would be hard-pressed to hold that the Board's retroactivity decision was not an appropriate exercise of its discretion.

Nor would our result be different if we engaged in an independent analysis under *SEC v.*

*Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) or *Chevron v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). The five factor analysis of *Chenery* is substantively no different than the three factor analysis of *Chevron*. *Chenery*, however, has been applied exclusively to administrative agency adjudications, the same context in which this case has arisen. *See e.g. E.L. Weigand Division v. NLRB*, 650 F.2d 463, 471 (3d Cir.1981) *Huson* on the other hand, appears to have been applied exclusively to judicial adjudications. As noted above, however, on this record an independent analysis under either test would reach the same result here.

612 (7th Cir.1983). Thus, unless the Board's retroactive application results in manifest injustice, we will uphold the Board's order.

### B.

In the present case the Board recognized all interests of all parties. It identified each interest and related the interests involved to the purposes of the Act. The Board considered the Act's policies of employee free choice and labor relations stability, and it examined the problems that would be entailed if it applied the now disclaimed *R.J. Smith* rule to pending § 8(f) cases. The Board, employing the retroactivity analysis of *SEC v. Chenery*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), balanced the claimed ill effects of retroactivity against the "mischief of producing a result which is contrary to a statutory design or to legal and equitable principles," *Id.* at 203, and concluded:

> [T]he statutory benefits from the announced changes in 8(f) law for employees, employers and unions in the construction industry far outweigh any hardships resulting from immediate imposition of those changes. Consequently, we will apply the Board's new 8(f) principles to this case and to all pending cases in whatever stage.

282 NLRB at ——, 124 LRRM at 1198.

We cannot perceive any "manifest injustice" which would indicate that we should not defer to the Board's reasoning on this issue. As the Board noted, a party such as Deklewa who relied on the *R.J. Smith* rule did so at its own risk, because once conversion occurred, the § 8(f) agreement would be automatically binding. The particular facts of this case aptly demonstrate this possibility.

In 1980, Deklewa became a member of the Iron Workers Employer Association of Western Pennsylvania, Inc. ("the Association") an organization composed of approximately 35 construction industry employers. In so doing, pursuant to a doctrine established by the Board in 1978, known as the merger doctrine[13] the relevant unit of employees for determining the majority status of a Union was not those employees specifically employed by Deklewa but was rather all other employees who were hired under the Association's agreement with the Union.

The factors which would have established the multi-employer unit of employees as having obtained majority status plainly appear on the stipulated record submitted by the parties to the Board and which is before us now.[14] Thus, even under the old *R.J. Smith* rule it appears entirely likely that the Board would have held that Deklewa was not free to repudiate its agreement with the Union.

Moreover, as the Board correctly points out in applying its new interpretation of § 8(f) to Deklewa's case, it has done nothing more than hold Deklewa and the Union to the terms and conditions of the § 8(f) contract into which they voluntarily entered. It was with these considerations in mind that the Board held *Deklewa* and all pending cases, subject to the new § 8(f) principles now adopted. We find no manifest injustice in that decision.

### VI.

Thus, both Deklewa's and the Union's petitions for review will be denied and the

---

**13.** This merger doctrine was established by the Board in *Amado Electric,* 238 NLRB 37, 99 LRRM 1453 (1978); and *Authorized Air Conditioning Company,* 236 NLRB 131, 98 LRRM 1538 (1978), *enf'd on other grounds,* 606 F.2d 899 (9th Cir.1979), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1598, 63 L.Ed.2d 785 (1980). The essence of the rule held that:

> [W]hen a single employer joins a multi-employer association and adopts that associations' collective bargaining agreement, the single employer's unit "merges" into the multi-employer unit when the requisite inquiry into majority support occurs in that multi-employer unit.

*Deklewa,* 282 NLRB at ——, 124 LRRM at 1189 & n. 14.

**14.** Among the factors which appear of record are: 1. a union security clause in the agreement between the Association and the Union (App. at 44); 2. actual union membership of a majority of the employees (App. at 31); and 3. all job referrals came from the Union's hiring hall. (App. at 30).

Board's cross-application for enforcement will be granted.