861 F.2d 1124
 129 L.R.R.M. (BNA) 3073, 57 USLW 2326,
110 Lab.Cas. P 10,807
 MESA VERDE CONSTRUCTION CO., Plaintiff-Appellee,
v.
NORTHERN CALIFORNIA DISTRICT COUNCIL OF LABORERS,
Defendant-Appellant.
MESA VERDE CONSTRUCTION COMPANY, Plaintiff-Appellee,
v.
CARPENTERS 46 NORTHERN CALIFORNIA COUNTIES CONFERENCE BOARD,
Defendant- Appellant.
 Nos. 85-1665, 85-2074.
 United States Court of Appeals,
Ninth Circuit.
 Argued En Banc and Submitted March 16, 1988.
Decided Nov. 15, 1988.
 
 Victor J. Van Bourg, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for defendants-appellants.
 Mark R. Thierman, Thierman, Cook, Brown & Mason, San Francisco, Cal., for plaintiff-appellee.
 Patrick J. Syzmanski, Washington, D.C., for amicus N.L.R.B.
 Lawrence Gold, Washington, D.C., for amicus Dist. Council of Carpenters of Seattle, King County & Vicinity, and Local 3 Intern. Union of Operating Engineers.
 G. Brockwell Heylin, Washington, D.C., for amicus Associated General Contractors of America, Inc.
 Douglas N. Friefield, San Francisco, Cal., for amicus W.B. Skinner, Inc.
 Judd H. Lees, Williams, Kastner & Gibbs, Bellevue, Wash., for amicus Ken Hash Const.
 Appeal from the United States District Court for the Northern District of California.
 Before GOODWIN, Chief Judge, WALLACE, ANDERSON*, HUG, TANG, SCHROEDER, FLETCHER, POOLE, WIGGINS, BRUNETTI, and KOZINSKI, Circuit Judges.
 WIGGINS, Circuit Judge:
 
 
 1
 The Northern California District Council of Laborers and the Carpenters 46 Northern California Counties Conference Board (together Laborers) appeal from the district court's declaratory judgment that Mesa Verde Construction Company (Mesa Verde) effectively repudiated pre-hire collective bargaining agreements between the parties. Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers, 598 F.Supp. 1092 (N.D.Cal.1984). A panel of this court affirmed, 820 F.2d 1006 (9th Cir.1987), but the Laborers' suggestion for rehearing en banc was subsequently granted. 832 F.2d 1164 (9th Cir.1987). We hold that the decision of the National Labor Relations Board (NLRB) in Deklewa v. International Ass'n of Bridge, Structural and Ornamental Ironworkers, Local 3, 282 N.L.R.B. No. 184, 1986-87 NLRB Dec. (CCH) p 18,549 (Feb. 20, 1987), enforced 843 F.2d 770 (3rd Cir.1988), determining that pre-hire collective bargaining agreements may not be unilaterally repudiated prior to a Board-certified election or termination of the contracts, applies in this circuit. We remand to the panel to determine whether to apply Deklewa retroactively under the principles of Chevron Oil Co. v. Huson, 404 U.S. 97, 106-07, 92 S.Ct. 349, 355-56, 30 L.Ed.2d 296 (1971).
 
 FACTS
 
 2
 The panel summarized the facts of the case:
 
 
 3
 Mesa Verde is a general contractor, specializing primarily in constructing shopping centers in Arizona, California, and Colorado. Mesa Verde typically subcontracts out most of its work except for some carpentry and odd jobs. In 1979 it reached its first agreement with the Laborers, and on June 26, 1980 it signed the contract with the Laborers that is here in dispute. The contract was to remain in effect until June 15, 1983 and would continue thereafter from year to year absent written notice by either party. By the contract's terms Mesa Verde agreed to "comply with all wages, hours, and working conditions set forth in the Laborers' Master Agreement for Northern California." That agreement is a sixty-seven-page contract between the Laborers, the Associated General Contractors of California, Inc. and the Bay Counties General Contractors Association. It sets wage rates for numerous jobs and provides for arbitration, with certain exceptions, of "any dispute concerning the interpretation or application of the agreement." On November 17, 1982 Mesa Verde and the Laborers agreed in writing that their 1980 contract would continue in effect until June 15, 1986.
 
 
 4
 Mesa Verde first entered into a collective bargaining agreement with the Carpenters in August 1979. Through a memorandum agreement Mesa Verde and the Carpenters accepted the Carpenters Master Agreement for Northern California, a forty-nine-page contract between the Carpenters, the Building Industry Association of Northern California, the California Contractors Council, Inc. and the Millwright Employers Association. That agreement sets rates for numerous jobs and provides for arbitration of "[a]ny dispute concerning the relationship of the parties, any application or interpretation of this Agreement." Through a subsequent memorandum agreement executed in June 1980 the parties accepted the new June 16, 1980 to June 15, 1983 Carpenters Master Agreement. On September 8, 1982 Mesa Verde and the Carpenters early extended the master agreement to June 15, 1986, with certain modifications limiting wage increases and providing more flexible working conditions for Mesa Verde.
 
 
 5
 Mesa Verde informed the unions of its intent to abrogate its agreements with them in May of 1984. At the time Mesa Verde was working on a project in Hercules, California, at which it employed members of both unions. Mesa Verde notified the Carpenters of its repudiation through a May 8, 1984 letter and notified the Laborers through a May 15, 1984 letter. In late May or early June of 1984, after its notice to the unions, Mesa Verde started another project in Orland, California without union workers, in contravention of the collective bargaining agreements, if they were still in effect. Both unions gave Mesa Verde notice of grievance and requested arbitration regarding Mesa Verde's contractual obligations for the Orland project.
 
 
 6
 Mesa Verde, 820 F.2d at 1007-08.
 
 
 7
 Mesa Verde sought a declaratory judgment that it was not obligated to arbitrate the grievances which arose after it gave notices of termination. The district court stayed arbitration of the grievances pending resolution of the declaratory judgment action. The court then granted Mesa Verde summary judgment against both the Carpenters and the Laborers. Mesa Verde, 598 F.Supp. at 1094. The court held that the collective bargaining agreements at issue were construction industry "pre-hire" agreements and that, therefore, under 29 U.S.C. Sec. 158(f) (section 8(f) of the National Labor Relations Act (NLRA)), Mesa Verde's May 1984 letters were sufficient to repudiate their agreements with respect to future projects. Mesa Verde, 598 F.Supp. at 1101. The court denied a subsequent motion by the Laborers to vacate the court's judgment and to grant the Laborers additional discovery to demonstrate the existence of a core group of employees. Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers, 602 F.Supp. 327, 330 (N.D.Cal.1985).
 
 
 8
 A panel of this court affirmed. It followed circuit precedent and held that unilateral repudiation by an employer of a pre-hire collective bargaining agreement was permitted. Mesa Verde, 820 F.2d at 1012; see also International Bhd. of Elec. Workers, Local 441 v. KBR Elec., 812 F.2d 495, 497-98 (9th Cir.1987); NLRB v. Pacific Erectors, Inc., 718 F.2d 1459, 1462-63 (9th Cir.1983). A majority of this court voted to rehear the Laborers' appeal en banc. 832 F.2d 1164 (9th Cir.1987). En banc review was limited to: (1) whether Deklewa should be applied retroactively to this case, and (2) whether the rule of Royal Dev. Co., Ltd. v. NLRB, 703 F.2d 363, 369 (9th Cir.1983), that a panel may not overrule prior panels' interpretations of the NLRA even when intervening NLRB cases decide differently, should be overruled.
 
 
 9
 Background--Judicial History of Section 8(f).
 
 
 10
 The NLRA generally requires that a union possess majority support before it may act as the bargaining representative for a group of employees. Sections 8(a)(1), (2) and 8(b)(1)(A), 29 U.S.C. Sec. 158(a), (b), collectively require that a union possess majority support before a collective bargaining agreement can be negotiated. See ILGWU v. NLRB, 366 U.S. 731, 737, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762 (1961) [hereinafter Garment Workers ]. Historically, however, the construction industry had established its own unique collective bargaining practices. One such practice was the use of pre-hire agreements between construction unions and employers that allowed the industry's employers to obtain a guaranteed work force before a particular job was begun. In 1948, the NLRB first asserted jurisdiction over the construction industry. See, e.g., Carpenters Local 74, 80 N.L.R.B. 533 (1948); Ozark Dam Constructors, 77 N.L.R.B. 1136 (1948); cf. In Re Johns Manville Corp., 61 N.L.R.B. 1 (1945). The Board refused to make any exceptions to its general rule that minority contracts were illegal and unenforceable. In a number of cases, the Board rejected the "general custom and practice in the construction industry" and held that pre-hire collective bargaining agreements were illegal and unenforceable. See, e.g., Daniel Hamm Drayage Co., 84 N.L.R.B. 458, 460 (1950) ("custom and practice" argument better directed to Congress than to the Board); Chicago Freight Car, 83 N.L.R.B. 1163 (1949). In response, Congress, recognizing the longstanding use of pre-hire agreements in the construction industry, added subsection (f) to section 8 of the NLRA. S.Rep. No. 187, 86th Cong., 1st Sess. 27 (1959), U.S.Code Cong. & Admin.News 1959, p. 2318, reprinted in I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 397, 423-24 1959) [hereinafter Leg.Hist.].[1]
 
 
 11
 Following the enactment of section 8(f), the Board first held that the majority status of a union executing a pre-hire agreement may not be challenged in an unfair labor practice proceeding. Bricklayers Local 3, 162 N.L.R.B. 476, 477-79 (1966), enforced 405 F.2d 469 (9th Cir.1968); Oilfield Maintenance Co., 141 N.L.R.B. 1384, 1387 and n. 10 (1963). See NLRB v. Local Union No. 103, Int'l Ass'n of Bridge Structural & Ornamental Ironworkers, 434 U.S. 335, 350-51, 98 S.Ct. 651, 660-61, 54 L.Ed.2d 586 (1978) [hereinafter Higdon ]. Thus, an employer could not unilaterally repudiate a pre-hire agreement with a union. The Board later switched its position regarding the repudiation issue and allowed unilateral repudiation of such pre-hire agreements. R.J. Smith Constr. Co., 191 N.L.R.B. 693 (1971), enforcement denied sub nom. Local 150, Int'l Union of Operating Eng'rs v. NLRB, 480 F.2d 1186 (D.C.Cir.1973); Ruttman Constr. Co., 191 N.L.R.B. 701 (1971) (companion case to R.J. Smith). In Ruttman, the Board stated:
 
 
 12
 [I]n enacting Section 8(f) to assist in resolving such problems, Congress merely permitted parties to enter into such pre-hire agreements without violating the Act. It does not mean that a failure to abide by such an agreement is automatically a refusal to bargain. In essence, therefore, this prehire agreement is merely a preliminary step that contemplates further action for the development of a full bargaining relationship....
 
 
 13
 Ruttman, 191 N.L.R.B. at 702. The Board in Ruttman dismissed Oilfield Maintenance as being "primarily concerned" with "the right of a successor-employer to disavow contracts made by a predecessor" employer. Id. at 701 n. 5; see also Higdon, 434 U.S. at 350-51, 98 S.Ct. at 660-61.
 
 DISCUSSION
 
 14
 As appears from our discussion of the history of section 8(f), the latest expression of opinion by the Board prior to Deklewa was that a pre-hire agreement could be terminated by the unilateral repudiation of it by either the employer or the union. We gave effect to that opinion in our circuit. See, e.g., KBR Elec., 812 F.2d at 497-98.
 
 
 15
 In Deklewa, the NLRB announced a new rule. The Board decided that section 8(f)[2] collective bargaining agreements may not be unilaterally repudiated by employers or unions. "When parties enter into an 8(f) agreement, they will be required ... to comply with that agreement unless the employees vote, in a Board-conducted election, to reject (decertify) or change their bargaining representative." Deklewa, 1986-87 NLRB Dec. (CCH) p 18,549, at 31,708. The Board expressly rejected R.J. Smith and Ruttman. It decided that pre-hire collective bargaining agreements should confer on a union at least some section 9(a) exclusive bargaining agent status. Deklewa, NLRB Dec. (CCH) at 31,709.
 
 
 16
 The primary issues before the en banc panel are whether this court has the power in view of existing Supreme Court precedent to adopt the rule of Deklewa as the law of this circuit, and if that power exists, whether it best serves the interests of employers and employees to do so.
 
 
 17
 I. Supreme Court Precedent.
 
 
 18
 Deklewa's non-repudiation rule seems to conflict with Supreme Court precedent set out in Jim McNeff, Inc. v. Todd, 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983); NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978) [hereinafter Higdon ]. In Higdon, the Court reversed a decision of the D.C. Circuit and upheld the NLRB's determination that an uncertified union with an 8(f) agreement with an employer committed an unfair labor practice under section 8(b)(7)(C), 29 U.S.C. Sec. 158(b)(7)(C), by picketing the employer to force it to adhere to the agreement. Higdon, 434 U.S. at 341, 98 S.Ct. at 655. In McNeff, the Court held that despite the repudiation of an 8(f) agreement by the employer, monetary obligations incurred by the employer to an uncertified union prior to the repudiation survived the repudiation. McNeff, 461 U.S. at 271-72, 103 S.Ct. at 1759. The Court stated, however, that 8(f) agreements may be repudiated at will. Id. at 270, 103 S.Ct. at 1758. Thus, it would seem that Supreme Court precedent requires that we reject Deklewa 's new rule. In neither case, however, did the Supreme Court definitively construe 8(f). Rather, the Court found that the Board's interpretation of 8(f) was an acceptable interpretation of the statute and that it reasonably implemented the purposes of the Act. The Court, therefore, deferred to the NLRB's interpretation of 8(f).
 
 
 19
 Specific language in both opinions supports our conclusion that the Supreme Court in Higdon and McNeff only deferred to the NLRB's interpretation of 8(f) and we are not precluded from adopting the Board's new interpretation. The Court in Higdon recognized that " '[t]he function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.' " Higdon, 434 U.S. at 350, 98 S.Ct. at 660 (quoting NLRB v. Truck Drivers Local Union No. 449, Int'l Bhd. of Teamsters, Chaffeurs, Warehousemen and Helpers of America, 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957)). The Court found that the Board's then current construction of section 8(f) in R.J. Smith, 191 N.L.R.B. 693 (1971), enforcement denied sub nom. Local 150, Int'l Union of Operating Eng'rs v. NLRB, 480 F.2d 1186 (D.C.Cir.1973), was not fundamentally inconsistent with the Act nor had the Board moved into a new area of regulation that Congress had not committed to it. Higdon, 434 U.S. at 350, 98 S.Ct. at 660; accord NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 499, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960) (Court rejected Board's policy decision because outside congressional mandate). The Court "concluded that the Board's construction of the Act, although perhaps not the only tenable one, is an acceptable reading of the statutory language and a reasonable implementation of the purposes of the relevant statutory sections." Higdon, 434 U.S. 341, 98 S.Ct. at 656. Thus, in Higdon, the Court did not independently construe the reach and scope of section 8(f). Rather, the Court recognized the expertise and experience of the Board in effectuating national labor policy as mandated by Congress and limited its review to whether the Board's interpretation of 8(f) was reasonable.
 
 
 20
 McNeff similarly is not an independent construction of 8(f). The Court relied on Higdon 's affirmance of the Board's view of the status of an 8(f) collective bargaining agreement. McNeff, 461 U.S. at 266-67, 103 S.Ct. at 1756-57. The Court noted that in Higdon it "approved the Board's conclusion that a 'pre-hire agreement is voidable.' " Id. at 269, 103 S.Ct. at 1758.[3] Also, as the Higdon Court recognized, "[a]n administrative agency is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision and should not approach the statutory construction issue de novo and without regard to the administrative understanding of the statutes." Higdon, 434 U.S. at 351, 98 S.Ct. at 660-61. We hold that neither Higdon nor McNeff preclude this court from adopting the view of the NLRB as expressed in Deklewa. Neither constitutes an independent construction of the statute.[4] Rather, the Supreme Court looked to the Board's interpretation, found it reasonable and consistent with the NLRA, and deferred to the Board's interpretation. Accord NLRB v. Action Automotive, Inc., 469 U.S. 490, 496, 105 S.Ct. 984, 988, 83 L.Ed.2d 986 (1985) ("In reviewing Board decisions, we consistently yield to the Board's reasonable interpretations and applications of the Act....").[5] We now turn to Deklewa to determine whether the Board's new approach is a reasonable and tenable construction of section 8(f).
 
 
 21
 II. Deklewa.
 
 
 22
 A. Legislative History of Section 8(f).
 
 
 23
 Congress enacted 8(f) in response to the "serious problems" created by the assertion of jurisdiction by the Board over the building and construction industry. Leg.Hist., supra, at 423. (Report of Senator Kennedy). Congress also recognized that the industry had special needs which the NLRA did not otherwise address. For an employee, "[t]he occasional nature of the employment relationship makes this industry markedly different from manufacturing and other types of enterprise. An individual employee typically works for many employers and for none of them continuously. Jobs are frequently of short duration, depending upon various stages of construction." Id. For the employer, "it is necessary for the employer to know his labor costs before making the estimate upon which his bid will be based. A second reason is that the employer must be able to have available a supply of skilled craftsmen ready for quick referral." Id. at 424. Enactment of section 8(f) represented a recognition of the industry's widespread use of pre-hire collective bargaining agreements designed to address these needs. Congress knew that these agreements were not entirely consistent with "rulings of the NLRB that exclusive bargaining contracts can lawfully be concluded only if the union makes its agreement after a representative number of employees have been hired." Id.; see also H.R.Rep. No. 741, 86th Cong., 1st Sess. 19, U.S.Code Cong. & Admin.News 1959, pp. 2318, 2424, reprinted in Leg.Hist., supra, at 759, 777-78 (following Senate Report in discussing special problems of construction industry). In passing section 8(f), Congress intended to ratify the use of such prehire agreements. The R.J. Smith approach, allowing unilateral repudiation of these collective bargaining agreements, has not in the Board's view advanced this evident congressional intent.
 
 
 24
 In refusing to enforce R.J. Smith, the D.C. Circuit noted that it could not "conceive of such an exercise in futility on the part of Congress as to validate a contract with a union having minority status, but to permit its abrogation because of the union's minority status." Local No. 150, Int'l Union of Operating Eng'rs v. NLRB, 480 F.2d 1186, 1190 (D.C.Cir.1973); see also NLRB v. Irvin, 475 F.2d 1265, 1271 (3d Cir.1973) ("[n]othing in either the text or the legislative history of Sec. 8(f) suggests that it was intended to leave construction industry employers free to repudiate contracts at will"); but see Higdon, 434 U.S. at 349, 98 S.Ct. at 659. We agree with the D.C. Circuit. When a construction employer "hires a union" it should be held to its bargain and not be allowed to back out of the deal at the employer's convenience. We find that the legislative history of 8(f) better supports Deklewa's non-repudiation rule rather than the R.J. Smith approach.
 
 
 25
 B. Labor Stability and Employee Free Choice.
 
 
 26
 Now that we have examined 8(f)'s legislative history, we turn to the two major interests at issue controlling whether pre-hire agreements should be voidable at will. First, sections 7 and 9 of the NLRA, 29 U.S.C. Secs. 157 & 159, grant employees complete "freedom of choice and majority rule in employee selection of representatives." Garment Workers, 366 U.S. at 739, 81 S.Ct. at 1608. Second, the structure of the collective bargaining process itself and such provisions as the "contract bar" of the Act guarantee labor relations stability to both employees and employers. 29 U.S.C. Sec. 159(c)(3) ("contract bar").[6] The balancing of these interests is certainly within the statutory mandate of the NLRB. Truck Drivers, 353 U.S. at 96, 77 S.Ct. at 647. In comparing R.J. Smith and Deklewa, it would seem that the former, by refusing to confer 9(a) status on a union that had not demonstrated majority support, serves the first interest while Deklewa serves the second.[7] See Higdon, 434 U.S. 341, 98 S.Ct. at 655 (noting R.J. Smith 's focus on employee free choice). However, based on its "expertise and in light of [its] experience in administering Section 8(f)", the Board in Deklewa perceived that the R.J. Smith voidability rule did not serve, but actually hindered effective expression of employee free choice while seriously damaging maintenance of labor stability in the construction trades. Deklewa, NLRB Dec. (CCH) at 31,706-07.
 
 
 27
 The appellee and amici here argue that by retaining the power to repudiate unilaterally a pre-hire agreement, employers have it in their power to protect their employees' "free choice" rights. We are mindful, as was the Board in Deklewa, that an employer's decision to repudiate is more likely based on "the employer's own economic considerations, without reference to or concern for the employees' desire to continue the status quo." Id. at 31,706.[8] Also, both the employer and the employees possess explicit statutory means by which to test employee support of a pre-hire bargaining representative.
 
 
 28
 By its terms, section 8(f) does not confer full 9(a) status on a union. The second proviso to the subsection states that the "contract bar" does not apply to an 8(f) agreement. R.J. Smith interpreted the second proviso to mean Congress intended to immunize only the preliminary contractual steps which precede an employer's acquisition of a workforce. R.J. Smith, 191 N.L.R.B. at 694. In R.J. Smith, the Board determined that the proviso, by limiting the 9(a) status of unions entering into pre-hire agreements, was proof that Congress intended that pre-hire agreements not be mandatory subjects of bargaining and thus voidable at will. Id. No necessary connection exists, however, between the right to seek a certification election and the right to refuse to follow a freely negotiated contract. We conclude that Deklewa's literal reading of the second proviso is a more likely reading of congressional intent than that given by R.J. Smith. An employer is not required to wait one year before seeking a representation election after he has entered into a pre-hire contract. An employer, who after a reasonable time perceives that he is bound by a contract with the union whose minority status seems permanent, may petition under section 9(c) for an election.[9] Likewise, employees may petition at any time under 9(c) or 9(e) to either fully certify a union under 9(a) or to decertify their putative union.[10] The Board's prior rule, allowing repudiation of such agreements in addition to these explicit statutory protections, has proved unwise. We agree with the Board that it should be rejected. Neither the language of the section nor its legislative history support such an extra-statutory self-help remedy.
 
 
 29
 The R.J. Smith approach also spawned another species of extra-statutory remedies to unions. Under the "conversion" doctrine, an 8(f) relationship and agreement may "convert" to a full 9(a) relationship and agreement. Conversion requires a showing that the signatory union enjoyed majority support, during a relevant period, among an appropriate unit of the employer's employees. Conversion may occur at any time during the working relationship, from several days to some years after the pre-hire agreement was negotiated. Conversion may occur without a majority of a unit's employees ever voting to accept a bargaining representative. See Deklewa, NLRB Dec. (CCH) at 31,705-07.
 
 
 30
 Indicia of majority support have included diverse and often complex evidentiary proof. The courts and the Board have looked at such factors as union membership roles, Pacific Erectors, 256 N.L.R.B. 421, 424 (1981), enforced sub nom. NLRB v. Pacific Erectors, Inc., 718 F.2d 1459, 1463 (9th Cir.1983), presence of enforced union security clauses, Irvin, 475 F.2d at 1270, employer use of referrals from exclusive union hiring halls, Construction Erectors Inc., 265 N.L.R.B. 786, 788 (1982), union administered fringe benefit programs, Davis Indus., 232 N.L.R.B. 946, 952 (1977), and employee statements and actions. Amado Elec., 238 N.L.R.B. 37, 39 (1978). Proof of these complex and difficult evidentiary issues is often lacking. Deklewa, NLRB Dec. (CCH) at 31,707. The courts and the Board also have been inconsistent in their application of these factors. See, e.g., Precision Striping, Inc. v. NLRB, 642 F.2d 1144, 1148 (9th Cir.1981) (existence of majority union membership insufficient); Authorized Air Conditioning Co. v. NLRB, 606 F.2d 899, 906 (9th Cir.1979) (union membership not necessarily proof of union support), cert. denied, 445 U.S. 950, 100 S.Ct. 1598, 63 L.Ed.2d 785 (1980); contra John Ascuaga's Nugget, 230 N.L.R.B. 275 n. 1 (1977) (absence of union membership does not necessarily indicate lack of majority support).
 
 
 31
 Determining the appropriate bargaining unit under the conversion doctrine is particularly difficult due to the fragmented nature of the employment relationship in the construction industry. The examination must determine whether there is a single employer or multiple employers and whether the employer uses a permanent and stable workforce or hires on a job-to-job basis. The answers to these questions will determine how and in what fashion conversion takes place. See Mesa Verde, 820 F.2d at 1009-11; KBR Elec., 812 F.2d at 497-98.
 
 
 32
 In addition to the evidentiary problems created by the conversion doctrine, it does little to promote employee free choice or foster labor relations stability. Conversion of an 8(f) agreement into a full 9(a) agreement may take place without the employees ever voting for or against a proposed union. Conversion can take place almost immediately after negotiation of a pre-hire agreement. Pacific Intercom, 255 N.L.R.B. 184, 191 (1981); Wheeler Constr. Co., 219 N.L.R.B. 541, 542 (1975) (conversion occurred immediately on the parties' adoption of an 8(f) agreement); cf. Carrothers Constr. Co., 258 N.L.R.B. 175 n. 1 (1981) (conversion took place ten years before an attempted repudiation). Rather than protect the free choice of employees to choose or reject a union, R.J. Smith and its associated conversion doctrine may often prevent them from ever voting for or against a particular union.
 
 
 33
 The doctrine does not further industry stability. Its complex nature inevitably fosters litigation, as in Mesa Verde, to establish whether conversion ever took place, among whom, and at what time. Neither the union, the employer, nor the employees can ever know with real certainty what their rights and obligations are under the contract. Deklewa completely eliminates these problems. On the signing of the contract, both parties will be required to comply with the agreement, absent a Board-conducted election to reject or change a bargaining representative. In determining the appropriate unit for election purposes, the Board will no longer distinguish between "permanent and stable" and "project by project" workforces. Single unit employer units will be presumed appropriate. Deklewa, NLRB Dec. (CCH) at 31,709.
 
 
 34
 In summary, we find that the Deklewa non-repudiation rule appears consistent with the legislative history of section 8(f), as well as the dominant principles of employee free choice and labor relations stability. Accordingly, we adopt Deklewa's non-repudiation rule as the law in this circuit. We now turn to the other issue presented for en banc review.
 
 
 35
 III. Royal Development.
 
 
 36
 On en banc review, we have also considered the "rule" of Royal Dev. Co., Ltd. v. NLRB, 703 F.2d 363, 369 (9th Cir.1983), that a panel of this court may not adopt a Board decision that conflicts with circuit precedent. The Mesa Verde panel stated that Royal Development precluded it from adopting Deklewa because circuit precedent had followed the R.J. Smith approach. Mesa Verde, 820 F.2d at 1013.
 
 
 37
 Both the Board and the circuit courts are charged with interpreting the NLRA and other labor laws. As noted, the Board's interpretation of its statutory mandate is entitled to deference. Also, the Board is free to change its interpretation of the law if its interpretation is reasonable and not precluded by Supreme Court precedent. We should defer to its judgment if reasonable. See Higdon, 434 U.S. at 350-51, 98 S.Ct. at 660-61.
 
 
 38
 The Royal Development rule, however, would seem to preclude a three-judge panel of this court from adopting a reasonable interpretation of labor law even though our prior precedent was adopted out of deference to the Board. We note the inconsistency of such a rule with our treatment of Higdon and McNeff in this case. By holding that these Supreme Court cases are not binding constructions of section 8(f), we recognize the deferential nature of judicial review of administrative decision-making. To accord decisions of our own court greater deference than that given to the Supreme Court, would be anomalous indeed. We hold, therefore, that if prior decisions of this court constitute only deferential review of NLRB interpretations of labor law, and do not decide that a particular interpretation of statute is the only reasonable interpretation, see United Food, 108 S.Ct. at 421, subsequent panels of this court are free to adopt new and reasonable NLRB decisions without the requirement of en banc review.[11]
 
 
 39
 Our holding is consistent with this and other circuits' past adoption of NLRB decisions which conflicted with prior circuit case law. For example, in Blueflash Express, 109 N.L.R.B. 591, 592 (1954), the Board examined the issue of "interrogations" by employers of employees' views about unions. The Board articulated an "all-the-circumstances" test to determine whether the interrogation restrained or interfered with employee rights under section 8(a)(1) of the NLRA, 29 U.S.C. Sec. 158(a)(1). This court adopted this standard in numerous cases. See, e.g., NLRB v. Brooks Cameras, 691 F.2d 912, 919 (9th Cir.1982); Lippincott Indus. v. NLRB, 661 F.2d 112, 114 (9th Cir.1981); Penasquitos Village, Inc. v. NLRB, 565 F.2d 1074, 1080 (9th Cir.1977). Later, the Board moved away from the "all-the-circumstances" test and adopted a per se rule that any such interrogation was unlawful under the Act. See, e.g., PPG Indus., 251 N.L.R.B. 1146, 1147 (1980); Paceco, a Div. of Fruehauf Corp., 237 N.L.R.B. 399, 400 (1978), vacated in part and remanded in part, 601 F.2d 180 (5th Cir.1979). The Ninth Circuit in turn has applied the per se rule. See, e.g., J.M. Tanaka Constr., Inc. v. NLRB, 675 F.2d 1029, 1037 (9th Cir.1982); NLRB v. Fort Vancouver Plywood Co., 604 F.2d 596, 599 n. 1. (9th Cir.1979), cert. denied, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980). Despite this conflicting case law, a panel of this circuit in Hotel Employees and Restaurant Employees Union, Local 11 v. NLRB, 760 F.2d 1006, 1009 (9th Cir.1985), affirmed the Board's return to the "all-the-circumstances" test.[12] The court found that the current approach was a consistent and reasonable interpretation of the Act and deferred to the Board's decision to change its standard. The court did not find that it was bound by the prior circuit precedents.
 
 
 40
 There are strong policy reasons why we should limit the Royal Development rule. First, Royal Development hinders the policy of judicial deference to "the Board's reasonable interpretations and applications of the [National Labor Relations] Act." Action Automotive, 469 U.S. at 496, 105 S.Ct. at 988. As the Supreme Court recently recognized in Chevron, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." 467 U.S. at 844, 104 S.Ct. at 2782. This is especially true " 'whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.' "Id. (quoting United States v. Shimer, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). Deference is due even when the administrative agency changes its interpretation of statutes. See Higdon, 434 U.S. at 351, 98 S.Ct. at 660. Royal Development inhibits this court in affording the deference due to reasonable NLRB interpretations where the circuit has ruled on an earlier interpretation, therefore impeding the NLRB's ability to change its interpretation in accord with its experience and altered objectives.
 
 
 41
 Second, Royal Development prevents the NLRB from enacting consistent, nationwide policies. Under the Royal Development rule, our circuit will be frozen on certain interpretations of NLRB statutes, whereas other circuits would not, depending on the random occurrence of cases within the circuits. For example, if all circuits were to follow Royal Development, the Ninth Circuit might be bound by the NLRB's 1963 interpretation of a given statute, the Second Circuit might follow a completely different 1971 interpretation, and the Fifth Circuit might be bound by a third interpretation handed down in 1984. Conversely, in the absence of Royal Development the NLRB could gain simultaneous and timely application of its interpretation throughout the country, thereby acting with the flexibility and policymaking power granted to it by Congress.
 
 
 42
 Third, Royal Development is likely to encourage unjustified appeals and delay by increasing the uncertainty as to the law that ultimately will be applied in any case where the NLRB has changed its interpretation after a circuit precedent upholding a prior circuit interpretation. Under Royal Development, the appeals court initially will apply the circuit's prior interpretation, but it is always possible that an en banc court will reconsider the issue and adopt the new interpretation if it is reasonable.
 
 
 43
 Fourth, it is likely that time constraints will preclude en banc review of most cases and Royal Development, therefore, will prevent the circuit from adopting the NLRB's reasonable interpretations of the statutes that it is entrusted to administer. Even if we make the improbable assumption that en banc courts will be able to review every case presenting a new NLRB interpretation, the en banc procedures required by Royal Development would constitute an enormous, unnecessary waste of time. The determination in the first instance whether an NLRB interpretation is reasonable is entrusted to three-judge panels, and such panels may easily make this same determination in cases where another panel already has addressed a prior interpretation of the statute.[13] For reasons of efficiency, en banc review concerning the reasonableness of an NLRB interpretation should be a matter of last resort, not the initial means of considering the new interpretation.
 
 
 44
 In summary, if a panel finds that a NLRB interpretation of the labor laws is reasonable and consistent with those laws, the panel may adopt that interpretation even if circuit precedent is to the contrary. This is so, however, only where the precedent constituted deferential review of NLRB decisionmaking. If the precedent held either that the NLRB decision was unreasonable or the only possible interpretation of the statute, then the Royal Development rule will apply.
 
 
 45
 We now turn to the final issue on en banc review--whether Deklewa should be applied retroactively to this case.
 
 
 46
 IV. Retroactivity.
 
 
 47
 In Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Supreme Court articulated the three factors applicable to retroactivity analysis:
 
 
 48
 First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed.... Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." ... Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."
 
 
 49
 Id. at 106-07, 92 S.Ct. at 355 (citations omitted).
 
 
 50
 We note that Deklewa overrules clear precedent that the employer in Mesa Verde obviously relied on in repudiating the pre-hire agreements. We remand to the Mesa Verde panel to apply the Chevron factors.
 
 CONCLUSION
 
 51
 We adopt Deklewa as the law of this circuit and hold that pre-hire agreements may not be unilaterally repudiated by either a union or an employer prior to its termination or absent an election among the appropriate bargaining unit's employees to reject the union. We find that Deklewa better advances the statutory objectives of the NLRA, better serves the goals of employee free choice and labor-management stability, and assists in reducing litigation fostered by prior precedent. We limit the Royal Development rule to cases where this circuit has found an NLRB interpretation unreasonable or the only possible construction of statute. We REMAND the issue of retroactivity to the Mesa Verde panel to consider that issue in light of Chevron Oil Co. v. Huson.
 
 
 52
 REMANDED.
 
 WALLACE, Circuit Judge, dissenting:
 
 53
 In Chevron U.S.A. Inc. v. National Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court set forth a two-step review of an agency's construction of the statute which it administers:
 
 
 54
 First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 55
 Id. at 842-43, 104 S.Ct. at 2781-82 (footnotes omitted). The Court has reaffirmed the continuing vitality of both the first step under Chevron, see, e.g., Bethesda Hospital Association v. Bowen, --- U.S. ----, 108 S.Ct. 1255, 1258, 99 L.Ed.2d 460 (1988); INS v. Cardoza-Fonseca, 480 U.S. 421, 107 S.Ct. 1207, 1220-21, 94 L.Ed.2d 434 (1987), and the second step. See, e.g., Fall River Dyeing & Finishing Corp. v. NLRB, --- U.S. ----, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987) (cited in NLRB v. United Food & Commercial Workers Union, --- U.S. ----, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987), as a case in which the Court applied the second step under Chevron ). When the Court interprets a statute under the first step of Chevron, its interpretation is conclusive and authoritative.
 
 
 56
 Although I believe the question is close concerning the Supreme Court's conduct in the pre-Chevron cases of Jim McNeff, Inc. v. Todd, 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983), and NLRB v. Local Union No. 103, International Association of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978), I am persuaded that the Supreme Court conclusively and authoritatively interpreted section 8(f), rather than merely deciding that the NLRB's interpretation was permissible. Thus, as a circuit court, we are bound to follow the Court's interpretation. Therefore, I concur in the result reached by Judge Hug and dissent from the majority opinion.
 
 
 57
 HUG, Circuit Judge, with whom Circuit Judges BRUNETTI and KOZINSKI concur, dissenting:
 
 
 58
 I respectfully dissent.
 
 
 59
 The principal issue in this case is whether a prehire agreement entered into under the authority of section 8(f) of the National Labor Relations Act ("NLRA") can be repudiated by the employer until the union establishes majority status. The Supreme Court, in a unanimous opinion and in language that could not be clearer, has held that it can be. The Court stated:A Sec. 8(f) prehire agreement is subject to repudiation until the union establishes majority status.
 
 
 60
 Jim McNeff, Inc. v. Todd, 461 U.S. 260, 271, 103 S.Ct. 1753, 1759, 75 L.Ed.2d 830 (1983).
 
 
 61
 Despite this clear statement in McNeff, the majority upholds a contrary view of the NLRB. It dismisses the language in McNeff on the ground that the Court there merely followed its prior decision, NLRB v. Iron Workers, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978) (hereinafter Higdon ). The majority feels, in turn, that the Court in Higdon did not actually construe section 8(f), but instead simply held that the Board's construction of section 8(f) was within a range of possible reasonable constructions. Such a limited holding would leave room for other, equally reasonable, constructions of the Act. Thus the majority contends that a new construction by the Board, even one which is directly contrary to the pronouncement of the Supreme Court in McNeff, is permissible if it can be justified as being reasonable. See Opinion at 1129-1131.
 
 
 62
 I part company from the majority because I believe the Supreme Court did definitively construe section 8(f) in both Higdon and McNeff, although the Court may have given deference to the Board's interpretation in doing so. The Court did not, as the majority suggests, decide only that the Board's interpretation was a reasonable construction of the Act subject to change at the agency's whim. Instead--after giving heightened consideration to the Board's arguments--the Court passed judgment upon the meaning of section 8(f) and such judicial interpretation is binding under our principle of stare decisis.
 
 I.
 
 63
 This case presents a vital question concerning the relative roles of the judiciary and administrative agencies in construing statutes, the importance of which, in my view, transcends the particular point of labor law at issue. We are here faced with a question of pure statutory interpretation. We are concerned with determining Congressional intent. Specifically, our inquiry is how Congress intended a prehire agreement to operate. The Supreme Court in Higdon and McNeff interpreted the statute after giving some deference to the interpretation of the NLRB, the agency charged with administering the Act. The NLRB, at that time, gave persuasive arguments that Congress intended to allow either party to repudiate the contract until the Union achieved majority status.
 
 
 64
 The NLRB's position, however, was by no means binding on the Court. Congress did not delegate to the NLRB the discretion to determine how a prehire agreement was to operate, allowing the Board to treat the agreement in any manner that the Board considered would best implement sound labor policy. Congress simply enacted section 8(f), which was to be interpreted by the courts. That section has been interpreted by the highest court authority--the United States Supreme Court--after careful consideration of the statutory language, legislative history, and the interpretation placed upon it by the agency charged with its enforcement. That interpretation must stand until it is overruled by the Supreme Court or until Congress amends the statute.
 
 
 65
 I therefore believe we are bound by Higdon and McNeff to reject the Board's new Deklewa rule. The majority apparently believes that the stare decisis value of Higdon and McNeff is vitiated by virtue of the deference accorded in those cases to the Board's interpretation of the Act. I submit that the majority misconceives the true nature of the deference granted in those cases. An examination of the role of deference in the two cases reveals that the Court did, in fact, render its own interpretation of section 8(f) and, in doing so, created precedent to which we must adhere.
 
 
 66
 Confusion in this area is quite understandable. A vast number of cases discuss the proper deference accorded to an agency's interpretation of a statute, but, as one distinguished author notes, such discussions are often laced with "verbalisms [that] have rarely been helpful and have usually been harmful; [and] are often uncertain, conflicting and even confusing." 5 K. Davis, Administrative Law Treatise, Sec. 29.1, at 334 (2d ed. 1984). Behind the confusing verbiage lies, I believe, two very distinct principles of judicial deference to agencies. Moreover, the two breeds of deference have vastly different effects on the principle of stare decisis. It is evident to me that the majority has mistaken one type of deference for the other, and thereby misjudged the stare decisis effect of both Higdon and McNeff.
 
 II.
 
 67
 The type of deference underlying the Supreme Court's ruling in Higdon and McNeff is appropriate in cases when the Court confronts a pure question of statutory construction. When the Court seeks to ascertain the meaning of an ambiguous statutory provision, it gives special consideration to the viewpoint of the agency charged with implementing the statute. Such deference is due because the agency "constitute[s] a body of experience and informed judgment to which courts ... may properly resort for guidance." Federal Maritime Bd. v. Isbrandtsen Co., 356 U.S. 481, 499, 78 S.Ct. 851, 862, 2 L.Ed.2d 926 (1958). As Davis notes, the deference given by judges for interpretations of administrators "is not at all surprising": it is simply a matter of "[d]eference of generalists for the views of specialists [which] could be deemed a part of the law of nature...." K. Davis, supra, at 400.
 
 
 68
 However, such deference does not intrude on the Court's role as the final authority on questions of statutory construction. As the Supreme Court stated in Securities Indus. Ass'n. v. Board of Governors, 468 U.S. 137, 143, 104 S.Ct. 2979, 2982, 82 L.Ed.2d 107 (1984), "Judicial deference to an agency's interpretation of a statute 'only sets "the framework for judicial analysis; it does not displace it." ' " See also Barlow v. Collins, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970) ("[When] the only or principal dispute relates to the meaning of the statutory term, the controversy must ultimately be resolved, not on the basis of matters within the special competence of the [agency], but by judicial application of canons of statutory construction."); Batterton v. Francis, 432 U.S. 416, 424, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977) ("[A]dministrative interpretations of statutory terms are given important but not controlling significance.").
 
 
 69
 Over the years, the Supreme Court has repeatedly affirmed its role as the final authority on issues of statutory construction. See, e.g., SEC v. Sloan, 436 U.S. 103, 118, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978) ("[T]he courts are the final authorities on issues of statutory construction [and] 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions....' " (Citations omitted.)); INS v. Cardoza-Fonseca, 480 U.S. 421, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987). ("The judiciary is the final authority on issues of statutory construction....") (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984)); Federal Election Comm'n v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); Bureau of Alcohol, Tobacco and Firearms v. F.L.R.A., 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983).
 
 
 70
 It is equally well-settled that deference is not due to an agency's construction of a statute where the statutory language is clear. United States v. Missouri Pacific R. Co., 278 U.S. 269, 280, 49 S.Ct. 133, 137, 73 L.Ed. 322 (1929); Swift Co. v. United States, 105 U.S. 691, 695, 26 L.Ed. 1108 (1881); United States v. Tanner, 147 U.S. 661, 663, 13 S.Ct. 436, 437, 37 L.Ed. 321 (1893). When the statutory language is ambiguous, the amount of weight given to the agency's interpretation depends on a variety of factors, such as the thoroughness of the agency's consideration, whether the agency's construction has been consistent over the years, and whether the timing of the agency's construction was contemporaneous with the passage of the statute. United States v. Sweet, 189 U.S. 471, 473, 23 S.Ct. 638, 638, 47 L.Ed. 907 (1902); Federal Maritime Bd. 356 U.S. at 499-500, 78 S.Ct. at 862-63; United States v. Johnston, 124 U.S. 236, 253, 8 S.Ct. 446, 455, 31 L.Ed. 389 (1888); United States v. American Trucking Ass'ns., Inc., 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345 (1940); United States v. Leslie Salt Co., 350 U.S. 383, 396-97, 76 S.Ct. 416, 423-24, 100 L.Ed. 441 (1956). See also Cardoza-Fonseca, 107 S.Ct. at 1221 n. 30 (less deference accorded to agency when agency has changed its mind).
 
 
 71
 With these principles in mind, it is evident that a court faced with an issue of pure statutory interpretation must make its own independent judgment as to the meaning of the statute. Because it is the final authority on such matters, it cannot delegate its function to the agency. Though a court may give a certain amount of deference to the agency's interpretation of the statute, its analysis must not end there. Rather, the court must either adopt the agency's position as its own interpretation of the Act, or adopt a construction other than that promoted by the agency. In either case, the court makes its own final judgment as to the meaning of the statute. The court's determination as to the meaning of the statute is no less its own simply because it accorded deference to the agency and accepted the agency's construction.
 
 
 72
 Because courts cannot escape their function as final authorities on issues of statutory interpretation, their decisions on such matters are binding regardless of the degree of deference given to the agency in reaching the decision. As the Supreme Court noted in Estate of Sanford v. Commissioner, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20 (1939), "[W]e should be ... free to reject [an administrative] practice when it conflicts with our own decisions. A change of practice ... will be accepted as controlling when consistent with our decisions." Id. at 53, 60 S.Ct. at 60 (emphasis added). In a similar vein, Justice Stevens noted the binding effect of the Supreme Court's decisions of statutory interpretation in Shearson American Express, Inc. v. McMahon, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), where he stated:
 
 
 73
 Gaps in the law must, of course, be filled by judicial construction. But after a statute has been construed, either by this Court or by a consistent course of decision by other federal judges and agencies, it acquires a meaning that should be as clear as if the judicial gloss had been drafted by the Congress itself.
 
 
 74
 Id. 107 S.Ct. at 2359 (J. Stevens, concurring and dissenting). To summarize, in cases where the Supreme Court confronts an issue of pure statutory interpretation, the deference accorded to the agency's construction of the statute does not impinge in the least upon the stare decisis effect of the decision. The decision is binding upon the agency and upon lower courts.[1]
 
 III.
 
 75
 The other type of deference is markedly different and readily distinguishable from the type discussed above. This is the deference given to an administrative agency when Congress has delegated to the agency the authority to further define the specifics of a general proposition of law. Unlike the deference discussed above, when this type of deference underlies a court's decision, stare decisis is affected. Exploring the roots of such deference demonstrates why.
 
 
 76
 In some instances, Congress purposefully does not resolve competing economic or social interests in particular areas and instead leaves this to the agency. In other situations, Congress enacts quite general provisions, with the specifics to be filled in by the agency. As noted in Chevron,
 
 
 77
 If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.
 
 
 78
 We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer....
 
 
 79
 Chevron, 467 U.S. at 843-44, 104 S.Ct. at 2782 (footnotes omitted). Thus there are two categories of delegation: (a) explicit delegation; and (b) implicit delegation.
 
 
 80
 The Chevron case itself provides excellent examples of both explicit and implicit delegation. The case concerned the Clean Air Act, the administration of which is entrusted to the Environmental Protection Agency ("EPA"). Congress directed the EPA to promulgate National Ambient Air Quality Standards, to publish a list of categories of pollution sources, and to establish new source performance standards for each. See Chevron, 467 U.S. at 846, 104 S.Ct. at 2783. This was an express delegation of authority by Congress to develop the specifics of general legislation. At issue in Chevron was the meaning of the statutory term "stationary source." There had been no specific delegation of authority to define that term. However, the Court found that Congress intended that there not be a static judicial definition of the term but, instead, a flexible definition to be applied by the EPA in order to carry out the general policy of the Act. Thus the Court found an implicit delegation of authority to the EPA to determine the meaning of "stationary source." See id. at 862-66, 104 S.Ct. at 2791-93.
 
 
 81
 When there exists an explicit delegation of authority to fill gaps in the legislation, this function is generally fulfilled by the adoption of regulations. When the agency enacts regulations or procedures designed to apply the statute to various factual situations its rule-making assumes a quasi-legislative character. See Batterton, 432 U.S. at 424 n. 8, 97 S.Ct. at 2405 n. 8 (" 'Administration, when it interprets a statute so as to make it apply to particular circumstances, acts as a delegate to the legislative power.' ") (Citations omitted.) See also NLRB v. Hearst Publications, Inc., 322 U.S. 111, 130-31, 64 S.Ct. 851, 860-61, 88 L.Ed. 1170 (1944); State of Montana v. Clark, 749 F.2d 740, 745 (D.C.Cir.1984), cert. denied, 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985). A court, in reviewing such regulations, is not actually confronted with an issue of statutory interpretation, for there is nothing in the statute per se to interpret: Congress left a gap, entrusting the agency to fill it. A reviewing court is not free to set aside those regulations simply because it would have refined the statute in a different manner. Batterton, 432 U.S. at 425, 97 S.Ct. at 2405. Thus, the judicial task when reviewing an agency's regulations designed to fill a gap left by Congress differs fundamentally from the judicial task in determining the meaning of the statute. In the former case, the court does not confront an issue of statutory interpretation and, thus, its authority is limited to reviewing the regulations to ensure that Congress gave the agency the power to make such regulations, and to ensure that the regulations are consistent with the statutory scheme. In the latter case, the court is the final authority as to the statute's meaning and may defer to the agency's interpretation as it deems appropriate, but its holding reflects a judicial construction of the statute. In both types of cases, the principle of deference is employed by courts, but the principle operates very differently in each context.
 
 
 82
 When the delegation from Congress is implicit rather than explicit, the principle is the same. In Chevron, the Court determined that the term "stationary source" in the Clean Air Act had been intended by Congress as a flexible definition to be refined by the EPA, to which it had entrusted wide discretion in administering the legislation. Thus, the Court's inquiry was only whether the EPA's construction of that term was reasonable. As in the case of an express delegation, where Congress contemplates future regulations, the Court deferred to the EPA's interpretation of the term as being a reasonable exercise of the delegated authority. Chevron, 467 U.S. at 865-66, 104 S.Ct. at 2793. This differs markedly from the deference given to an agency in resolving a pure question of statutory interpretation.
 
 
 83
 As an example of how the principle of deference operates in each context, it is useful to contrast Chevron with Cardoza-Fonseca. In Chevron, the Court determined that Congress left a gap in the statute for the agency to fill; consequently, the Court exercised very limited review of the agency's regulations. Chevron, 467 U.S. at 845, 104 S.Ct. at 2783. In Cardoza-Fonseca, however, the Court found that the question before it was a "pure question of statutory construction for the courts to decide" and rejected the agency's interpretation of the statute. Cardoza-Fonseca, 107 S.Ct. at 1220-21.
 
 
 84
 As previously noted, stare decisis operates with full force whenever a court decides a question of statutory interpretation, regardless of the amount of deference given to the agency in reaching its decision.
 
 IV.
 
 85
 With this framework of statutory analysis in mind, the next step is to examine what the Supreme Court actually did in the Higdon and McNeff cases, when it construed section 8(f) of the NLRA. Did the Court, as I maintain, make a determination of Congressional intent as to the type of contract that a prehire agreement was meant to be? Or did the Court merely find that Congress delegated to the NLRB the task of determining the contractual nature of a prehire agreement, and that the NLRB's determination was reasonable, thus leaving the agency free to adopt other positions at a later time?
 
 
 86
 I begin with Higdon. In that case, the Court held that the Board properly applied section 8(b)(7)(C) of the NLRA to a section 8(f) prehire agreement. The Board had held that picketing to enforce a section 8(f) prehire agreement was tantamount to recognitional picketing, and that section 8(b)(7)(C) was violated when the union failed to request an election within 30 days.
 
 
 87
 In analyzing the Court's discussion of section 8(f) within the framework of statutory analysis I have set forth above, it is apparent to me that the interpretation of section 8(f) is one of pure statutory construction. The deference given to the Board was that of considering the Board's position in arriving at that construction.
 
 
 88
 There is no indication that there was either an express or implicit delegation to the Board to refine standards or to fill in gaps in section 8(f). Nor is it a situation in which the statute is merely being applied to the facts of a particular case. It is purely a construction of what Congress intended in enacting section 8(f). There are extensive references in Higdon to the legislative history and statutory policy of Congress.[2] The Court concluded that although the Act made prehire agreements in any other industry an unfair labor practice, Congress intended to create an exception for the construction industry. The Court found that Congress authorized an employer and a union to enter into a voluntary prehire agreement in the construction industry without the union having achieved majority status, and that Congress did not give prehire agreements any other status within the NLRA. It was a voluntary agreement that could be repudiated until the union achieved majority status.
 
 
 89
 The majority cites the following language in the Higdon opinion.
 
 
 90
 We have concluded that the Board's construction of the Act, although perhaps not the only tenable one, is an acceptable reading of the statutory language and a reasonable implementation of the purposes of the relevant statutory sections.
 
 
 91
 Id. 434 U.S. at 341, 98 S.Ct. at 656 (footnote omitted). The majority interprets this language to mean that the Court did not "independently construe the reach and scope of section 8(f)." Maj. op. at 1129-30. I do not read it that way. In my mind, the Court simply articulated the deference it gave to the Board's views in reaching its own interpretation of the statute.
 
 
 92
 Certainly, if Higdon leaves any doubt, there is abundant language in McNeff to demonstrate that, in both cases, the Court arrived at its own interpretation of Congressional intent in enacting section 8(f). The issue in McNeff was whether the monetary obligations of a section 8(f) prehire agreement could be enforced prior to repudiation. The opinion repeatedly acknowledged that a section 8(f) agreement was voidable. The references throughout McNeff are to the intent of Congress in enacting section 8(f). For example, the Court stated:
 
 
 93
 In upholding the Board's view that a union commits an unfair labor practice by picketing to enforce a prehire agreement before it has attained majority status, we noted in Higdon that this view protects two interests that Congress intended to uphold when it enacted Sec. 8(f).
 
 
 94
 ....
 
 
 95
 [O]ur decision in Higdon promotes Congress' "intention ... that prehire agreements were to be arrived at voluntarily...." Higdon, 434 U.S., at 348, n. 10 [98 S.Ct., at 659, n. 10]. In accord with this intention, we approved the Board's conclusion that a "prehire agreement is voidable" "until and unless [the union] attains majority support in the relevant unit." Id., at 341 [98 S.Ct., at 655]. Allowing the union to picket to enforce a prehire agreement before it attains majority status is plainly inconsistent with the voidable nature of a prehire agreement.
 
 
 96
 The concerns with the Sec. 7 rights of employees to select their own bargaining representative and our fidelity to Congress' intent that prehire agreements be voluntary--and voidable --that led to our decision in Higdon are not present in this case.
 
 
 97
 ....
 
 
 98
 In a Sec. 301 suit, the District Court merely enforces a contract entered into by the employer--a contract that Congress has legitimated to meet a special situation even though employees themselves have no part in its negotiation or execution. Such enforcement does not grant the plaintiff union a right otherwise enjoyed only by a majority union except in the very narrow sense, expressly intended by Congress, that employers and minority unions in the construction industry do not violate the Act by entering into prehire agreements. There is no sense in which respondents' contract action has a recognitional purpose like that forbidden in Higdon.
 
 
 99
 Neither does respondents' Sec. 301 action trench on the voluntary and voidable characteristics of a Sec. 8(f) prehire agreement. It is clear in this case that petitioner entered into the prehire agreement voluntarily. Moreover, although the voidable nature of prehire agreements clearly gave petitioner the right to repudiate the contract, it is equally clear that petitioner never manifested an intention to void or repudiate the contract.... Whatever may be required of a party wishing to exercise its undoubted right to repudiate a prehire agreement before the union attains majority support in the relevant unit, no appropriate action was taken by petitioner to do so in this case. Consequently, respondents' suit does not enervate the voluntary and voidable characteristics of the prehire agreement.
 
 
 100
 Apart from not offending the concerns noted in Higdon, allowing a minority union to enforce overdue obligations accrued under a prehire agreement prior to its repudiation vindicates the policies Congress intended to implement in Sec. 8(f). Congress clearly determined that prehire contracts should be lawful to meet problems unique to the construction industry.
 
 
 101
 Id. 461 U.S. at 267-71, 103 S.Ct. at 1757-59 (footnotes omitted) (emphasis added).
 
 
 102
 Throughout the opinion, the Court repeatedly referred to the prehire agreements as being voluntary and voidable with the undoubted right of a party to repudiate the agreement prior to the union achieving majority status. The constant reference to the "voidable nature" of such agreements serves as a strong reminder that the Supreme Court has decided the issue before us in this case and, in doing so, has discerned the Congressional intent behind section 8(f) and rendered its own independent interpretation of that section. As previously discussed, the Court had no choice but to render its independent construction of section 8(f) for it was faced with a pure question of statutory construction. The Supreme Court is the final authority on such matters and the deference it gives to the Board's view cannot impinge on the stare decisis effect of its ruling.
 
 V.
 
 103
 The majority points to a line of cases in which this circuit adopted a changed Board position, even in face of prior circuit precedent upholding the former Board position. See Opinion at 1135. The cases cited are ones in which we reviewed the Board's test for determining whether an employer's interrogation of an employee regarding union activities violates the employee's rights under section 8(a)(1) of the NLRA. The majority is quite correct in pointing out that the Board over the years changed its test from an "all the circumstances" test to a "per se" rule and back again. Despite the vacillation, and even though we had previously upheld the per se rule, (see, e.g., NLRB v. Fort Vancouver Plywood Co., 604 F.2d 596, 599 n. 1 (9th Cir.1979)), we affirmed the Board's return to the "all the circumstances" test in Hotel Employees & Restaurant Employees Union, Local 11 v. NLRB, 760 F.2d 1006, 1009 (9th Cir.1985).
 
 
 104
 The majority, however, has again failed to examine the type of deference operating in those cases. Those cases did not involve questions of pure statutory interpretation, but rather questions relating to the Board's application of a statutory provision to the facts in particular cases. Specifically, the cases dealt with the standard developed by the Board to apply section 8(a)(1) of the NLRA to circumstances in which an employer interrogates an employee about the employee's union sympathies. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the [employee organizational] rights...." 29 U.S.C. Sec. 158(a)(1). In applying the statutory proscription on a case-by-case basis, the Board, at different times, developed two different evidentiary requirements. Under the "per se" standard developed by the Board, any questions concerning union sympathies were deemed inherently coercive in violation of section 8(a)(1). See Hotel, 760 F.2d at 1007. Under the "all the circumstances" test, the interrogation was found unlawful only where " 'under all the circumstances the interrogation reasonably tend[ed] to restrain or interfere with the employees in the exercise of rights guaranteed by the Act.' " Id. at 1008 (citation omitted).
 
 
 105
 These differing standards represent a classic example of the Board applying the statute to everyday situations. The review in those cases is directed towards the Board's manner of enforcing the Act, not to the meaning of the statutory language itself. As in all cases which apply the law to everyday circumstances, the proper scope of review of the Board's standard in Hotel was "for rationality and consistency with the Act." Id. The panel concluded, "A standard which considers the totality of the circumstances surrounding an employee interrogation is a realistic approach to the enforcement of section 8(a)(1). It is a standard that is consistent with the Act because the Board ... can determine, on a case-by-case basis, whether all the facts demonstrate coercive behavior." Id. at 1009 (emphasis added).
 
 
 106
 In sum, the line of cases cited by the majority do not provide authority for this court's departure from either Supreme Court precedent or this circuit's precedent in which questions of statutory meaning are decided.[3]
 
 VI.
 
 107
 I agree with the majority that we must treat our own circuit precedent in a manner consistent with our treatment of Supreme Court precedent. The majority achieves its consistency by overruling Royal Development v. NLRB, 703 F.2d 363 (9th Cir.1983). My belief is simply that, when a panel of our court decides an issue of pure statutory construction, its ruling is binding on future panels and may be departed from only by an en banc panel. This is so despite the deference accorded to the agency in arriving at that interpretation of the statute.
 
 CONCLUSION
 
 108
 I believe the ramifications of the majority's ruling extend far beyond the area of labor law into the entire realm of administrative law. Underlying the majority's holding is, in my mind, a misconception of the nature of deference given to an agency on a purely legal question of statutory interpretation. In the name of administrative deference, the majority would deprive this court of its role of divining Congressional intent behind a statutory provision, and assign that role to the agency charged with administering the statute. The potentially grave consequences resulting from this misapplication of the deference principle need not be enumerated here.
 
 
 109
 I reiterate my position that McNeff and Higdon constitute binding precedent which we are obliged to follow. The Supreme Court's holdings, in my view, cannot be dismissed as simply affirming the Board's then-position while leaving room for the Board to adopt the opposite approach at a later point in time. Rather, the Supreme Court in those cases construed section 8(f) and found, after giving a certain amount of deference to the Board's views, that Congress intended prehire agreements to be voidable. We are bound by that determination unless and until such time the Court overrules its prior opinions or Congress amends the statute.
 
 
 110
 KOZINSKI, Circuit Judge, with whom BRUNETTI, Circuit Judge, joins, dissenting:
 
 
 111
 "It is, emphatically, the province and duty of the judicial department, to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803). To Marbury 's ringing pronouncement the majority would add a codicil: "until and unless the agency charged with administering the law changes its mind." According to the majority, if a federal court relies on an agency's interpretation of a statute, the court's construction is binding only until the agency decides the statute means something else altogether. At that point the court, or a higher court, or a lower court, may--nay, must--follow the agency's new interpretation unless that interpretation is unreasonable. This, I respectfully suggest, results in a significant shift of authority from the judiciary to the executive branch. Whenever Congress charges an agency, board, commission or department with administering a statute--I would venture to guess that this includes a substantial majority of our most significant federal laws--the judges become the handmaidens of the agency, relegated to deciding not what the law is, but only whether the agency's construction of the law is reasonable.
 
 
 112
 This is no small change. Courts and agencies are fundamentally different, both institutionally and functionally. Judicial decisionmaking is hedged about with a variety of constitutional safeguards designed to protect it from manipulation by the political branches. In interpreting statutes, courts are bound to find and apply the meaning endowed them by Congress and the President. It is emphatically not the function of courts to read policy content into statutes, or to interpret them in a way that will foster a particular political viewpoint. Administrative agencies, by contrast, are designed to bend with the political winds. The leadership and policy direction of executive departments change with every administration; members of so-called independent agencies are appointed with reference to their political affiliations. Agency officials are expected to rely on their views of public policy in carrying out their responsibilities.
 
 
 113
 Because judges must read a statute in the way that best reflects its meaning, courts are far slower than agencies in overruling their decisions. Once a circuit interprets a statute, only an en banc panel of the same court or the Supreme Court may adopt a different construction; only the Supreme Court may modify or reverse its own prior construction of a statute. By contrast, agencies can change their outlook as often and easily as a chameleon changes its color. A change of administration may prompt an executive department to alter its position on a particular piece of legislation overnight. As positions taken by a regulatory agency may hinge on a narrow majority, appointment of a single commissioner may drastically change the agency's approach to its organic statute.
 
 
 114
 This difference between the constraints on the judiciary and the broad freedom afforded agencies derives directly from the disparate functions they perform. When courts interpret a statute, they search for its true meaning--and there can never be more than one true meaning. To be sure, reasonable minds may differ as to what that meaning may be; occasionally it may be necessary to correct a judicial decision that misreads that meaning. But in performing their proper function, judges must listen for the voice of the legislature, not to the sound of their own heartbeats. Because courts are bound by the best construction of the statute, they may alter their interpretation only in response to a powerful new insight as to the law's meaning, not because a different panel of judges prefers a different result.
 
 
 115
 Agencies, on the other hand, may turn on a dime: Their proper function is to fill in policy gaps pursuant to an explicit or implicit delegation of authority from Congress. See, e.g., Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974) ("[t]he power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress"). Where Congress has delegated such authority, the statute becomes a clear vessel which changes its tint as it is filled and refilled by various policy pigments. Because the agency administering the statute is not bound to a single formulation of statutory language, it may make changes without considering whether the new approach more accurately reflects the meaning of the statute.
 
 
 116
 Both types of decisionmaking processes serve a vital function so long as each is confined to its own sphere. The majority goes astray in conflating the two. This error has the effect of displacing the courts' methodical, deliberate search for a law's meaning with the policy judgment of a politically responsive administrative agency. This is troubling both as a jurisprudential and as a practical matter.
 
 
 117
 Jurisprudentially, I am troubled by the majority's implicit holding that the meaning of a statute can change in an instant simply because an administrative agency has said so. Statutory meaning is not a matter of hopes or wishes; it is a fact. In settling on a particular interpretation of a statute, the court is saying: "This is the meaning that was actually conferred upon this statute by Congress." In reaching that conclusion, the court looks first at the statute's language and structure, but may also rely on the statute's legislative history and the view of the agency charged with its enforcement. A change in the agency's view alters this calculus and may motivate a reviewing court to reconsider the soundness of its prior interpretation. But a change in an agency's position cannot automatically alter the meaning Congress gave the statute years earlier.
 
 
 118
 By reaching the contrary conclusion, the court is, in effect, holding that statutes have no fixed meaning, that in passing laws Congress approves a range of possible interpretations, each as good as the next. While this approach fits in neatly with the popular mythology, conceived and nurtured in legal academies, that words are incapable of conveying precise concepts, it "undermines the basic principle that language provides a meaningful constraint on public and private conduct." Trident Center v. Connecticut General Life Ins. Co., 847 F.2d 564, 569 (9th Cir.1988). Needless to say, I disagree with this approach which, in my view, represents a serious abdication of judicial responsibility.*
 
 
 119
 And this brings me to the practical problems wrought by today's decision. The en banc court's ruling--should it become the law of the land--will make hundreds, perhaps thousands, of laws that have been conclusively interpreted by the courts subject to uncertainty whenever there is a shift in the political winds. A brief survey of recent cases in which the Supreme Court has relied on an agency's interpretation suggests the scope of the problem. See, e.g., NLRB v. United Food and Commercial Workers Union, Local 23, --- U.S. ----, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987) (Brennan, J.) (relying on the NLRB's construction of 29 U.S.C. Sec. 160, section 10 of the National Labor Relations Act, as holding that an order sustaining a settlement is not subject to judicial review); Lukhard v. Reed, 481 U.S. 368, 107 S.Ct. 1807, 95 L.Ed.2d 328 (1987) (Scalia, J.) (plurality opinion) (upholding a state interpretation of 42 U.S.C. Secs. 601-615 treating personal injury awards as income, rather than resources, for purposes of Aid to Families with Dependent Children, in part because the interpretation was consistent with the Secretary of Health and Human Services' interpretation); id. 107 S.Ct. at 1816 (Blackmun, J., concurring) (basing his vote solely on the deference due the Secretary's interpretation of the statute); Young v. Community Nutrition Institute, 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986) (O'Connor, J.) (relying on the Food and Drug Administration's interpretation of 21 U.S.C. Sec. 346 as empowering the FDA to determine when it must promulgate a regulation to control the addition of potentially deleterious substances to food); United States v. City of Fulton, 475 U.S. 657, 106 S.Ct. 1422, 89 L.Ed.2d 661 (1986) (Marshall, J.) (relying on the Secretary of Energy's construction of section 5 of the Flood Control Act of 1944, 16 U.S.C. Sec. 825, as permitting him to put new rates for sale of hydroelectric power into effect on an interim basis); United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (White, J., for a unanimous Court) (relying on the Army Corps of Engineers' construction of section 301 and 502 of the Clean Water Act, 33 U.S.C. Secs. 1311 and 1362 as covering all fresh water wetlands that are adjacent to other waters of the U.S.); Connecticut Dep't of Income Maintenance v. Heckler, 471 U.S. 524, 105 S.Ct. 2210, 85 L.Ed.2d 577 (1985) (Stevens, J., for a unanimous Court) (relying on the Secretary of Health and Human Services' definition of "institution for mental diseases" in the Medicaid Act, 42 U.S.C. Secs. 1396d(a)(1), (a)(4)(A) and (a)(15)); Cornelius v. Nutt, 472 U.S. 648, 105 S.Ct. 2882, 86 L.Ed.2d 515 (1985) (Blackmun, J.) (relying on the Merit Systems Protection Board's definition of "harmful error" in the Civil Service Reform Act of 1978, 5 U.S.C. Sec. 7701(c)(2)(A)). See also Annotation, Supreme Court's View as to Weight and Effect to Be Given, on Subsequent Judicial Construction, to Prior Administrative Construction of Statute, 39 L.Ed.2d 942, Sec. 3 (1973) (collecting cases exemplifying the general rule that the Supreme Court affords substantial deference to the interpretation of a statute by the agency charged with its administration).
 
 
 120
 Our circuit has deferred to agency construction of statutes in an equally wide range of cases. See, e.g., Railway Labor Executives' Ass'n v. United States, 811 F.2d 1327 (9th Cir.1987) (relying on the ICC's definition of the term "new carrier" in 49 U.S.C. Sec. 10901 as including a railroad company with a contract to operate an existing line); Pathfinder Mines Corp. v. Hodel, 811 F.2d 1288 (9th Cir.1987) (relying on the Department of Interior Board of Land Appeals' interpretation of 30 U.S.C. Sec. 21 as withdrawing game preserve lands from entry for mining); Kim v. Meese, 810 F.2d 1494 (9th Cir.1987) (relying on the INS's interpretation of 8 U.S.C. Sec. 1256 as holding that an alien is obliged to assert all grounds for eligibility when he first applies for adjustment of permanent resident status); Largo v. Sunn, 835 F.2d 205 (9th Cir.1987) (relying on the Secretary of Health and Human Services' interpretation of 42 U.S.C. Sec. 602(a)(18) as allowing states to determine eligibility for Aid to Families with Dependent Children on the basis of actual costs); Washington State Dep't of Game v. ICC, 829 F.2d 877 (9th Cir.1987) (relying on the ICC's interpretation of section 8(d) of the National Trails System Act, 16 U.S.C. Sec. 1247(d) as requiring prospective trail users to negotiate an agreement with the railroads before using abandoned railroad rights-of-way as wilderness trails); Marathon Oil Co. v. United States, 807 F.2d 759 (9th Cir.1986) (relying on the Mineral Management Service's construction of the Mineral Lands Leasing Act, 30 U.S.C. Secs. 181-287, as permitting use of a net back valuation formula to determine the wellhead value of natural gas for royalty purposes), cert. denied, 480 U.S. 940, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987); City of Angoon v. Hodel, 803 F.2d 1016 (9th Cir.1986) (relying on the Secretary of the Interior's interpretation of section 22(k)(1) of the Alaska Native Claims Settlement Act, 43 U.S.C. Sec. 1621(k), that harvesting restrictions run from the date of the enactment, rather than from the date of conveyance), cert. denied, --- U.S. ----, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987).
 
 
 121
 This handful of examples barely hints at the scope of the problem created by today's decision. If deference means blind adherence to the agency's construction as it meanders through the range of non-irrational meanings, federal judges should plan to take a long holiday and observe from afar as the body of federal law develops without their further meaningful input. A change of this magnitude in the relationship between the judicial and executive branches of government should come from the Supreme Court, if it comes at all. I can only hope that the Court will have occasion for sober reflection on the wisdom of the approach taken by our court today and by the Third Circuit in International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 3 v. NLRB, 843 F.2d 770 (3rd Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988).
 
 
 
 *
 Judge Anderson participated in the argument of this case, but died before the decision was rendered
 
 
 [1]
 The history of the passage of the amendment to section 8 was protracted. In 1951, a bill was first introduced by Senators Taft and Humphrey to allow pre-hire agreements, but it failed to obtain approval in the 82nd Congress. Similar bills, supported by the Eisenhower administration, were introduced in every Congress after that. Finally, in 1958, Senators Kennedy and Ervin proposed an amendment substantially similar to the original bill and it was ultimately signed into law
 
 
 [2]
 Section 8(f), 29 U.S.C. Sec. 158(f) (Agreement Covering Employees in the Building and Construction Industry), provides:
 It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in section 8(a) of this Act [subsec. (a) of this section] as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 9 of this Act [29 USCS Sec. 159] prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: Provided, That nothing in this subsection shall set aside the final proviso to section 8(a)(3) of this Act [subsec. (a)(3) of this section]: Provided further, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 9(c) or 9(e) [29 USCS Sec. 159(c) or (e) ].
 
 
 [3]
 Even in McNeff, the Court noted that it did not decide that in every case a section 8(f) contract may be unilaterally repudiated. "We need not consider in this case whether considerations properly cognizable by a court under Sec. 301 might prevent either party, in particular circumstances, from exercising its option under Sec. 8(f) to repudiate a prehire agreement before the union demonstrates majority status." McNeff, 461 U.S. at 271 n. 13, 103 S.Ct. at 1759 n. 13. The instant case is likewise a section 301, 29 U.S.C. Sec. 185, contract enforcement case
 
 
 [4]
 The Third Circuit recently enforced the NLRB's decision in Deklewa. 843 F.2d at 781-82. The court's examination of Higdon and McNeff comports with our own:
 In neither case has the Supreme Court adopted the Board's R.J. Smith interpretation of Sec. 8(f) as definitive and binding. Indeed, inHigdon, ... [t]he Supreme Court thus made clear that it was merely reviewing the Board's interpretation of Sec. 8(f) and not substituting its own judgment or prescribing its own interpretation of the statute....
 While McNeff is not as explicit as Higdon in making it clear that the Supreme Court was merely reviewing the Board's interpretation and not establishing one of its own, nowhere in the McNeff opinion does the Court hold that the statute requires Sec. 8(f) agreements to be voidable. Furthermore, McNeff relies very heavily upon Higdon which did make it clear that the Court was doing no more than holding that the Board's reading of the act was reasonable.
 Id. at 776.
 
 
 [5]
 The Supreme Court in Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), recently set out the proper scope of judicial review of an agency's construction of statute:
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 "The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.
 We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations
 "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.
 "If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."
 In light of these well-settled principles it is clear that the Court of Appeals misconceived the nature of its role in reviewing the regulations at issue. Once it determined, after its own examination of the legislation, that Congress did not actually have an intent regarding the applicability of the ... program, the question before it was not whether in its view the concept is "inappropriate" in the general context of a program ... but whether the Administrator's view that it is appropriate in the context of this particular program is a reasonable one.
 Id. at 842-45, 104 S.Ct. at 2781-83 (footnotes and citations omitted). See also, NLRB v. United Food and Commercial Workers Union Local 23, --- U.S. ----, 108 S.Ct. 413, 421, 426, 98 L.Ed.2d 429 (1987) (Scalia, J. concurring) (discussing Chevron ).
 
 
 [6]
 The "contract bar" provides that once a certification election is held within an appropriate bargaining unit, no other election may be held for twelve months
 
 
 [7]
 Section 8(f) confers only limited 9(a) status on unions that have pre-hire agreements with employers. The second proviso to section 8(f) allows for a certification or decertification election at any time during a contract period in contradiction to the normal presumption of majority support enjoyed by a full 9(a) bargaining representative. Deklewa also noted:
 [e]ven absent an election, upon the contract's expiration, the signatory union will enjoy no majority presumption and either party may repudiate the 8(f) relationship. The signatory employer will be free at all times from any coercive union efforts, including strikes and picketing, to compel the negotiation and/or adoption of a successor agreement.
 Deklewa, NLRB Dec. (CCH) at 31,709.
 
 
 [8]
 Congress was also aware that:
 [a] substantial majority of the skilled employees in this industry constitute a pool of such help centered about their appropriate craft union. If the employer relies upon this pool of skilled craftsmen, members of the union, there is no doubt under these circumstances that the union will in fact represent a majority of the employees eventually hired.
 Leg.Hist., supra, at 424.
 
 
 [9]
 Section 9(c), 29 U.S.C. Sec. 159(c) (Hearings on questions affecting commerce--Rules and regulations), states:
 (1) Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board--
 * * *
 (B) by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in section 9(a) [subsec. (a) of this section];
 the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.
 
 
 [10]
 Section 9(e), 29 U.S.C. Sec. 159(e) (Secret ballot--Limitation of elections), states:
 (1) Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to section 8(a)(3), of a petition alleging they desire that such authority be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer. (2) No election shall be conducted pursuant to this subsection in any bargaining unit or any subdivision within which, in the preceding twelve-month period, a valid election shall have been held.
 In Deklewa, the Board set out its policy covering the results of such elections:
 A vote to reject the signatory union will void the 8(f) agreement and will terminate the 8(f) relationship. In that event, the Board will prohibit the parties from reestablishing the 8(f) relationship covering unit employees for a 1-year period. The purpose of this general prohibition is to preclude an employer and a union both from ignoring the electorally expressed preference of a majority of unit employees and from maintaining an 8(f) relationship during a period when the Act precludes holding another election, the availability of which is the sine qua non safeguard to permitting and enforcing an 8(f) contract. Failure to terminate the 8(f) relationship or its premature reestablishment after an election will subject the parties to 8(a)(2) and 8(b)(1)(A) liability.
 Deklewa, NLRB Dec. (CCH) at 31,709 (footnotes omitted).
 
 
 [11]
 On a pure question of statutory construction, our first job is to try to determine congressional intent, using "traditional tools of statutory construction." If we can do so, then that interpretation must be given effect ... however, where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based upon a permissible construction of the statute.... Under this principle, we have traditionally accorded the Board deference with regard to its interpretation of the NLRA as long as its interpretation is rational and consistent with the statute."
 Id. (citations omitted).
 
 
 [12]
 Hotel Employees did not cite the Royal Development rule. The court noted that the "all-the-circumstances" test "conflict[ed] with a few Ninth Circuit cases" following a per se rule. Id. at 1008
 
 
 [13]
 As noted above, such cases do not merit en banc review because there exists no conflict with prior decisions
 
 
 [1]
 Of course, after operating under a decision of the Court, the agency may persuade the Court that the Court's initial construction of the statute was erroneous, and may urge the Court to adopt an alternative construction. The Court may be persuaded to do so, for the agency's experience in implementing the statute under the former construction may demonstrate that such a construction could not have been intended by Congress in light of the difficulties it poses for implementation, or in light of other policy reasons unveiled since the Court's decision. But for the Court to adopt the later agency position, it would have to overrule its prior decision adopting the former construction
 
 
 [2]
 See e.g.,
 The Board's position is rooted in the generally prevailing statutory policy that a union should not purport to act as the collective bargaining agent for all unit employees, and may not be recognized as such, unless it is the voice of the majority of the employees in the unit.
 ....
 As for Sec. 8(b)(7), which, along with Sec. 8(f), was added in 1959, its major purpose was to implement one of the Act's principal goals--to ensure that employees were free to make an uncoerced choice of bargaining agent. As we recognized in Connell Construction Co. v. Plumbers & Steamfitters, 421 U.S. 616 [95 S.Ct. 1830, 44 L.Ed.2d 418] (1975), "[o]ne of the major aims of the 1959 Act was to limit 'top down' organizing campaigns, in which unions used economic weapons to force recognition from an employer regardless of the wishes of his employees." Id., at 632 [95 S.Ct., at 1840], and references cited therein.
 ....
 Congressional concern about coerced designations of bargaining agents did not evaporate as the focus turned to the construction industry. (n. 10)
 (n. 10) Congress was careful to make its intention clear that prehire agreements were to be arrived at voluntarily, and no element of coercion was to be admitted into the narrow exception being established to the majority principle. Representative Barden, an important House floor leader on the bill and a conferee, introduced as an expression of legislative intent Senator Kennedy's explanation the year before of the voluntary nature of the prehire provision[.]
 Higdon, 434 U.S. at 344-48, 98 S.Ct. at 657-59 (emphasis added).
 
 
 [3]
 Another example of the agency changing its position with this court's approval is the Board's treatment of representation elections. Over a period of 20 years, the NLRB changed its position four times on the issue of when a representation election should be set aside on the grounds of misrepresentation. NLRB v. Best Products Co., Inc., 765 F.2d 903, 910 (9th Cir.1985). The NLRB vacillated between the Hollywood Ceramics standard, where an election would be set aside when there was a "substantial departure from the truth," and the Shopping Kart Food Market standard, under which an election would not be set aside solely because there had been misrepresentations of fact. See Best, 765 F.2d at 910-11 (discussing NLRB's changes of policy). In Best, this court upheld the Board's adherence to the Shopping Kart standard even though the Board had vacillated between the two standards, and even though this court had previously upheld the Hollywood Ceramics standard. See, e.g., NLRB v. Sauk Valley Mfg. Co., Inc., 486 F.2d 1127, 1131 (9th Cir.1973). We recognized in Best, "The Board may alter its standards provided that its new rules are both rational and consistent with the Act." 765 F.2d at 912. We noted that the "NLRB has wide discretion to determine representation matters and questions arising during election proceedings," id. at 908, and confined our standard of review to two inquiries: (1) "whether the Board acted within an area of regulation committed to it by Congress," and (2) "whether the Board properly applied the correct legal standard." Id. at 907. We concluded that there was a " 'reasonable basis in law' for the Board's change of policy" and deferred to the Board's decision. Id. at 913. Again, this is the type of deference which is properly employed in reviewing a Board's application of the statute to the facts of particular cases. It must not be confused with the deference accorded to an agency's view of the meaning of the statute. As with the line of cases mentioned in the majority opinion, this example provides no support for departing from prior circuit precedent on issues of statutory construction
 
 
 *
 A reassuring inconsistency suggests the majority is not entirely comfortable with its own prescription: Specifically, the majority goes to great pains to demonstrate that Deklewa 's interpretation of section 8(f) is not merely permissible, but preferable. Majority opinion at 1132-34. Thus, the court observes that "Deklewa 's literal reading of the second proviso [of section 8(f) ] is a more likely reading of congressional intent than that given by R.J. Smith," id. at 1132 (emphasis added), and concludes that "[t]he Board's prior rule, allowing repudiation of such agreements in addition to these explicit statutory protections, has proved unwise." Id. at 1133. Such ruminations have no legitimate place within the analytical framework adopted by the majority: If we are bound to follow the Board, we must approve even a poor interpretation of the statute, so long as it falls within the range of permissible meanings. Future courts might be wise to note the majority's concern with what "best serves the interests of employers and employees," id. at 1129, and then do as we do, not as we say